**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**


| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | No. 700 CAP |
| Appellee | Appeal from the Judgment of Sentence entered on November 15, 2013 in the Court of Common Pleas of Philadelphia County, Criminal Division, at No. CP-51-CR-0000573-2009 |
| v. | |
| OMAR SHARIF CASH, | ARGUED: September 9, 2015 |
| | RESUBMITTED: January 20, 2016 |
| Appellant | |


## OPINION


**JUSTICE TODD**                                    **DECIDED  MAY 25, 2016**

In this direct capital appeal, Appellant Omar Sharif Cash challenges the November 15, 2013 judgment of sentence of death imposed by the Court of Common Pleas of Philadelphia County after a jury convicted him of first-degree murder and possession of an instrument of crime ("PIC").  For the reasons that follow, we affirm.


### I.  Factual and Procedural History

On April 21, 2008, at approximately 3:30 p.m., Appellant shot and killed Muliek Brown at the Winning Edge Carwash, located on Frankford Avenue in Philadelphia. The shooting was caught on the carwash's surveillance video, which showed Brown cleaning the tire rims of his car and Appellant approaching him from behind and shooting him in the back of the head.  Following the shooting, Appellant fled the scene, and Robert Green, a carwash employee who watched the shooting take place on a

monitor inside the carwash's office, called 911. Shortly thereafter, Philadelphia Police Officer Richard Hayes arrived at the scene and observed Brown lying face down with his knees on the ground, a bullet hole in his head, and two spent cartridge casings on the ground next to his body, which ballistics evidence later confirmed were fired from the same gun. Brown was transported to Temple University Hospital, where he was pronounced dead the following day. An autopsy later confirmed that Brown died as a result of a single gunshot wound to the head.

As Officer Hayes was securing the scene, his partner, Officer Pross, was approached by Marcus Howard, who indicated that he saw a light-complexioned male with a "Muslim beard" and wearing a black hoodie and Capri shorts — consistent with Appellant's appearance — flee the scene. N.T., 11/04/13, at 42. Officer Pross placed the description over police radio, and Howard later provided a written statement confirming the description. Green also provided a written statement to the officers, as well as the carwash surveillance footage of the shooting.

Meanwhile, shortly after the shooting, off-duty Police Officer James Kuzowsky was driving near the scene when he observed a woman crying in the carwash's parking lot. As Officer Kuzowsky approached the woman, he spotted Appellant running from the carwash. Sensing that something was amiss, Officer Kuzowsky made a U-turn and began following Appellant to the 2000 block of Buckius Street, where Appellant stopped outside of a home to speak with two individuals. Officer Kuzowsky turned on his hazard lights to make it appear as though he was waiting for someone, but Appellant noticed him, made eye contact, and pulled a black gun out of his sleeve. At that point, Officer Kuzowsky sped past Appellant, made a right onto Coral Street, and drove toward Valetta Street, at which time he stopped and exited his vehicle. Continuing to monitor Appellant's movement, Officer Kuzowsky watched Appellant climb into a gray Nissan

pickup truck at the intersection of Coral and Buckius Streets, and proceed northbound on Coral Street. Officer Kuzowsky then returned to his vehicle and began following the truck at a high rate of speed for approximately two to three minutes until he decided to end the pursuit for safety reasons.

Over the course of the next few days, Officers Kuzowsky, Green, and Howard each identified Appellant from a photographic array, and, on April 24, 2008, the police obtained a warrant for his arrest. Although the police initially were unable to locate Appellant, they ultimately secured his arrest on May 13, 2008 in New York City. Appellant was extradited to Philadelphia on August 4, 2008, where he was subsequently charged with first-degree murder and PIC.

The case proceeded to a jury trial before the Honorable Sandy L. V. Byrd on November 4, 2013, during which the Commonwealth presented, *inter alia*, the surveillance video footage of the murder, which showed Appellant walking back and forth next to the carwash, and, minutes later, entering the carwash and shooting Brown from behind; eyewitness testimony from Officers Kuzowsky, Green, and Howard identifying Appellant as the perpetrator; testimony from several of the investigating police officers; and testimony from Assistant Medical Examiner Dr. Edwin Lieberman,[1] who performed the autopsy on Brown and opined that gunpowder found on the wound indicated the gun's muzzle was fired within inches of Brown's scalp and skull, and that the bullet entered Brown's skull and pierced his pituitary gland. N.T., 11/5/13, at 88.

Appellant testified in his own defense, claiming that he had been pursued by Brown and his compatriots in the days leading up to the incident, and that, as a result,

---

[1] The trial court's Pa.R.A.P. 1925(a) opinion refers to Dr. Lieberman as "Dr. Edward Lieberman." Trial Court Opinion, 12/23/14, at 3. However, the transcript refers to Dr. Lieberman as "Dr. Edwin Lieberman." N.T., 11/5/13, at 81.

he shot Brown out of passion and fear for his life. Specifically, he described that, on the night of Friday, April 18, 2008, he was conversing outside of a bar with the family of his acquaintance "Weewee," who indicated that a "guy with a beard" recently had stolen a gun from one of them. N.T., 11/6/13, at 66-68. Appellant detailed that, the next day, he was at the bar shooting pool with Brown, Weewee, Bobby Harris, and a man named TJ, when the men began asking whether anyone had heard about someone taking the gun or had seen anyone trying to sell a gun. Appellant testified that he informed the group that he knew who had the gun, but that the man "wasn't going to just give it back to them." Id. at 71. He then recounted that he told the group that the man wanted $400 for the gun, but emphasized that "[he] wasn't just going to send them around there to him because [he] would have to worry about it coming back here to [him] trying to do something to me for doing something to him." Id. at 72. Appellant explained that, at that point, the men thought that he was trying to cover for the man who stole the gun, which caused the conversation to escalate, and ultimately resulted in security asking the men to leave. Appellant testified that, as they were leaving, the men told him "It's cool. We won't holler at you," which Appellant viewed as an indication that they were "probably going to try to do something to me." Id.

According to Appellant, early in the morning of April 21, he was walking to a friend's house when Weewee appeared across the street and fired shots at him, grazing his neck. Appellant stated that TJ and Brown — whom he described as carrying an AR-15 firearm — were also pursuing him, but he was able to run away. Appellant noted that he had additional encounters with the men twice more that day, leaving him "scared," "upset," and with "no regard for anything at that point." Id. at 88-89. Appellant then described that, approximately 15 to 30 minutes after his last encounter with Brown, he was walking past the carwash when he noticed Brown's car parked inside. Appellant

related that, at that point, he "was so enraged and scrambled that . . . [his] passions [were] inflamed" and he believed that "either [he] was going to get killed or [he] would have to kill one of them," or "this ain't going to stop," ultimately causing him to "snap" and shoot Brown inside the carwash.  Id. at 92-93.

Appellant's counsel sought a voluntary manslaughter charge, which the trial court denied.  The jury later convicted Appellant of both crimes, and the trial proceeded to the penalty phase, during which the Commonwealth offered evidence regarding Appellant's prior murder, kidnapping, robbery, and rape convictions stemming from a 2008 incident, and Appellant offered evidence that he suffered from anti-social personality disorder and a troubled upbringing.  At the conclusion of the penalty hearing, the jury found one aggravating factor — that Appellant had a significant history of violent felony convictions[2] — as well as several circumstances satisfying the "catchall" mitigating factor concerning Appellant's character and record.[3]  Ultimately, the jury concluded the aggravating factor outweighed the mitigating factor, and it returned a sentence of death, which the trial court imposed on November 15, 2013.  Thereafter, Appellant filed a post-sentence motion challenging, *inter alia*, the weight of the evidence supporting the jury's verdict.  The trial court denied the motion, and Appellant filed the instant direct appeal, raising nine issues.  We address them *seriatim*.

## II.  Analysis

### A.  Sufficiency of the Evidence

---

[2] 42 Pa.C.S. § 9711(d)(9).

[3] 42 Pa.C.S. § 9711(e)(8).

Appellant first argues the evidence was insufficient to sustain his first-degree murder conviction because the Commonwealth failed to prove that he acted with malice when he killed Brown.[4] Specifically, Appellant contends that, rather than acting with malice, he acted out of fear that he would be killed by Brown and his cohorts, claiming that he had been shot at and "terrorized" by the men shortly before the incident, which prompted him to take "preemptive action." Appellant's Brief at 16.

By contrast, the Commonwealth maintains that the evidence was indeed sufficient to sustain Appellant's first-degree murder conviction because Appellant snuck up behind Brown and shot him in the back of the head, a shooting to a vital part of the body from which malice may be inferred. The Commonwealth highlights that the murder was captured on a surveillance video and showed Appellant's face; that Appellant was identified as the perpetrator by three different individuals; and that Appellant fled the city and state after committing the crime, evidencing his consciousness of guilt. Additionally, the Commonwealth asserts that the jury was entitled to discredit Appellant's account of the events leading to the murder and that, even if the jury believed Appellant's testimony, such testimony could not establish a lack of malice because Appellant had sufficient time to cool off after the alleged provocation.

In its Pa.R.A.P. 1925(a) opinion, the trial court concluded that the Commonwealth's evidence — which the court noted included video footage of Appellant "stealthily" approaching Brown and shooting him the back of the head; testimony from the medical examiner regarding the close proximity of the gun to Brown's head;

---

[4] Initially, Appellant baldly suggests that he "must be awarded an arrest of judgment on all charges" based on the sufficiency of the evidence; however, he only discusses the evidence regarding his first-degree murder conviction. Appellant's Brief at 14. Thus, we address Appellant's sufficiency claim only with respect to his first-degree murder conviction.

Appellant's own admission to shooting Brown; and Appellant's subsequent flight from the scene — "clearly" was sufficient to prove beyond a reasonable doubt that Appellant committed first-degree murder. Trial Court Opinion, 12/23/14, at 11, 12.

Although Appellant's challenge to the sufficiency of the evidence focuses exclusively on whether the evidence was sufficient to prove that he acted with malice, it is this Court's well established practice in direct appeals from the imposition of a sentence of death to review the sufficiency of the evidence presented with respect to each of the elements necessary to sustain a first-degree murder conviction. See Commonwealth v. Parrish, 77 A.3d 557, 561 (Pa. 2013). In so doing, we determine "whether the evidence admitted at trial, and all the reasonable inferences derived therefrom viewed in favor of the Commonwealth as verdict winner, supports the jury's finding of all the elements of the offense beyond a reasonable doubt." Commonwealth v. Smith, 985 A.2d 886, 894-95 (Pa. 2009).

To sustain a conviction for first-degree murder, the Commonwealth must establish beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill. Commonwealth v. Laird, 988 A.2d 618, 624-25 (Pa. 2010). The Crimes Code defines an intentional killing as a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). It is well settled that "[p]remeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death," and "can be formulated in a fraction of a second." Commonwealth v. Jordan, 65 A.3d 318, 323 (Pa. 2013).

Based upon our thorough review of the record, we conclude the evidence viewed in the light most favorable to the Commonwealth as verdict winner was sufficient to prove beyond a reasonable doubt that Appellant committed first-degree murder. As

discussed above, the carwash surveillance video clearly showed Appellant approach Brown from behind and shoot him in the back of the head, three witnesses identified Appellant as the perpetrator, and Appellant confessed to killing Brown. The fact that Appellant placed a gun to the back of Brown's head and pulled the trigger is itself sufficient to establish malice, see Commonwealth v. Mikell, 729 A.2d 566, 569 (Pa. 1999) ("act of placing a gun to the back of [the victim's] head and pulling the trigger evinced actual malice"), and, in any event, the specific intent to kill may be inferred where, as here, the accused uses a deadly weapon on a vital part of the victim's body. Commonwealth v. Briggs, 12 A.3d 291, 306 (Pa. 2011). Moreover, while Appellant claims that he did not act with malice because he shot Brown out of passion and fear resulting from Brown's alleged pursuit of him earlier that day, even if it believed Appellant's account of the events leading up to the murder, the jury could have reasonably concluded under the evidence presented — including video footage of Appellant walking back and forth outside of the carwash several minutes prior to the murder — that any provocation had dissipated by the time Appellant shot Brown. Accordingly, the evidence of record fully supports Appellant's first-degree murder conviction regardless of Appellant's claimed version of events.

## B. Weight of the Evidence

In a related argument, Appellant contends that he is entitled to a new trial because the guilty verdict for first-degree murder was against the weight of the evidence. Specifically, Appellant maintains that the "greater weight of the evidence" introduced at trial — namely, his testimony — established that, based upon Brown's actions earlier that day and in days prior, he reasonably believed that Brown and his cohorts were going to kill him. Appellant's Brief at 17. Thus, according to Appellant, the

weight of the evidence proves that he killed Brown as a result of fear, passion, and provocation, rather than malice.

The Commonwealth responds by emphasizing that Appellant's claim is based solely upon his own self-serving, unsupported testimony, which it suggests lacks credibility, given that Appellant has prior *crimen falsi* convictions. The Commonwealth further opines that it was within the jury's province as the finder-of-fact to reject Appellant's version of the events leading to the murder, and argues that, in doing so, the jury's verdict was "soundly" based on the evidence of record, which overwhelmingly established that Appellant killed Brown with malice and specific intent and, thus, did not shock one's sense of justice. Commonwealth's Brief at 22.

Similarly, in addressing Appellant's claim, the trial court noted that the record indicated that the jury considered all of the evidence during its deliberations and that Appellant failed to identify any particular fact which the jury should have given greater weight. Thus, the court opined that the verdict "could in no way be said to shock one's sense of justice." Trial Court Opinion, 12/23/14, at 13.

The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Commonwealth v. Cousar, 928 A.2d 1033, 1036 (Pa. 2007). Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." Commonwealth v. Rivera, 983 A.2d 1211, 1225 (Pa. 2009). An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Commonwealth v. Champney, 832 A.2d 403, 408 (Pa. 2003). Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the

evidence as to shock one's sense of justice." Commonwealth v. Diggs, 949 A.2d 873, 879 (Pa. 2008).

Here, Appellant's claim is grounded entirely on his opinion that the jury should have given more weight to his unsubstantiated testimony that he acted out of passion and fear than to the overwhelming evidence of his guilt offered by the Commonwealth. We may not find that the trial court abused its discretion in rejecting his weight of the evidence claim under such circumstances. Moreover, it was entirely within the jury's province as the finder-of-fact to believe the evidence presented by the Commonwealth — which fully supported the jury's verdict — and to discredit Appellant's testimony, as it apparently did here. See Commonwealth v. Smith, 861 A.2d 892, 896 (Pa. 2004) (finding that jury's decision not to credit appellant's statement does not indicate that appellant's guilty verdict was against the weight of the evidence). Accordingly, because Appellant cannot demonstrate that his guilty verdict so shocked one's sense of justice as to lead to the conclusion that the trial court abused its discretion in declining to grant relief, Appellant's second claim fails.

### C. Voluntary Manslaughter Charge

Appellant next asserts that the trial court erred in refusing to charge the jury on voluntary manslaughter, again claiming that his testimony established that he killed Brown out of fear, passion, and provocation resulting from Brown's prior attempts to shoot him. Appellant suggests that this testimony provided a sufficient basis to charge the jury on voluntary manslaughter; that it was possible that the jury would have returned a verdict of voluntary manslaughter if such a charge had been given; and, thus, because of the absence of this charge, that he is entitled to a new trial.

Conversely, the Commonwealth responds that a voluntary manslaughter instruction was not warranted because the evidence would not have reasonably supported a verdict on that basis. The Commonwealth reasons that, rather than showing that Appellant suddenly committed the murder out of passion or fear, the surveillance video showed Appellant put on a hood, sneak up behind Brown without being detected, put a gun to Brown's head, and shoot him, thereby demonstrating that Appellant's actions were deliberate and methodical. Additionally, the Commonwealth contends that, even accepting Appellant's claims that Brown and his cohorts shot at him earlier that morning, the alleged attack occurred hours before Appellant killed Brown, providing Appellant with ample opportunity to cool off after the supposed provocation.

Consistent with the Commonwealth's position, the trial court reasoned that it did not abuse its discretion in denying Appellant's request for a voluntary manslaughter charge because such an instruction was not supported by the facts of this case. Specifically, the trial court noted that Appellant's claim that he acted under a sudden and intense passion lacked evidentiary support, as Appellant failed to offer any witnesses to support his version of events and never contacted law enforcement to report the shooting which allegedly had occurred earlier that day. The court further reasoned that, even assuming that the jury believed Appellant's story, there was a sufficient amount of time between the alleged provocation and the time in which Appellant spotted Brown at the carwash for Appellant to "engage in cool reflection to realize that killing another was not the best course of action." Trial Court Opinion, 12/23/14, at 26.

It is well settled that a voluntary manslaughter instruction "is warranted only where the offense is at issue and the evidence would support such a verdict." Commonwealth v. Sanchez, 82 A.3d 943, 979 (Pa. 2013) (quoting Commonwealth v.

Montalvo, 986 A.2d 84, 100 (Pa. 2009) (internal quotation marks omitted)).  To support a verdict for voluntary manslaughter, the evidence must show that, at the time the appellant killed the victim, he "acted under a sudden and intense passion resulting from serious provocation by the victim."  Montalvo, 986 A.2d at 100.  The test for "adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection."  Commonwealth v. McCusker, 292 A.2d 286, 290 (Pa. 1972).

Here, rather than establishing that Appellant acted under a sudden and intense passion at the time he killed Brown, the evidence of record — including, most notably, the carwash surveillance video showing Appellant deliberately approach Brown from behind and shoot him in the back of the head — evinced that Appellant acted with malice and the specific intent to kill.  While Appellant testified that he killed Brown out of passion and fear resulting from allegedly having been provoked earlier that day by Brown and his cohorts, and while he suggests that such testimony was sufficient to support a verdict for voluntary manslaughter, critically, Appellant's testimony did not establish that he was acting under a sudden and intense passion at the time he killed Brown.  Rather, as the Commonwealth has noted, Appellant's testimony, even if believed, indicates that Appellant had last been pursued by Brown at least 15 to 30 minutes prior to the incident, rendering Appellant more than capable of cool reflection by the time he approached Brown from behind at the carwash and shot him in the back of the head.  Moreover, the surveillance footage showing Appellant walking back and forth outside the carwash minutes before the murder further supports such a conclusion, as it shows that Appellant was not acting in a fit of passion, but, rather, was carefully deliberating about whether to enter the carwash.  Accordingly, the record did not

warrant a voluntary manslaughter charge, and, thus, the trial court did not abuse its discretion in refusing to provide the jury with such an instruction.

### D. Prosecutorial Misconduct

In his next claim, Appellant posits that the trial court erred in failing to grant a mistrial as a result of prosecutorial misconduct. Specifically, during his closing argument, the prosecutor made several comments describing that Appellant "executed" Brown and referring to the murder as an "execution." N.T., 11/7/13, at 20, 24, 25, 35. The prosecutor also twice described the alleged pursuit of Brown and his cohorts on Appellant as "g[ue]rilla warfare." Id. at 20, 21. Appellant's counsel objected to these comments, and, while the trial court overruled the objection pertaining to the guerilla warfare comment, it ultimately sustained the objection to the prosecutor's use of the word "execution" and instructed the jury to "[d]isregard the word 'execution.'" Id. at 35. Later, before the trial court began charging the jury, Appellant's counsel moved for a mistrial based upon the prosecutor's comments. The trial court offered to give the jury an additional curative instruction, which Appellant's counsel declined, and, thereafter, the court denied the motion. Appellant claims the prosecutor's comments were an improper expression of his personal opinion, unfairly prejudiced the jury, and deprived him of a fair trial, and he asserts that the trial court's failure to grant a mistrial under these circumstances was manifestly unreasonable.

The Commonwealth, conversely, argues that the trial court properly declined to award a mistrial, explaining that the prosecutor's reference to the murder as an "execution" did not prejudice Appellant because it was an accurate way to describe the murder, and that the prosecutor's reference to "guerilla warfare" was not prejudicial

because it merely described the attacks that Appellant had claimed *other* individuals directed against him.

In reviewing this claim, the trial court concluded that it did not err in refusing to grant a mistrial because the prosecutor's comments merely supported his argument that Appellant's killing was intentional, and were a permissible response to Appellant's characterization of the killing. The court further explained that, even if the prosecutor's comments were inappropriate, the court issued curative instructions to diminish any potential prejudice, and it later offered to issue an additional curative instruction, which counsel declined.

A prosecutor "has great discretion during closing argument" and is "free [to present] his [or her closing] arguments with logical force and vigor." Commonwealth v. Eichenger, 108 A.3d 821, 836 (Pa. 2014) (citation omitted). Thus, we will allow "vigorous prosecutorial advocacy" if "there is a reasonable basis in the record for the [prosecutor's] comments." Commonwealth v. Robinson, 864 A.2d 460, 516 (Pa. 2004) (internal quotation marks omitted). Stated differently, "[p]rosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair." Commonwealth v. Chmiel, 30 A.3d 1111, 1146 (Pa. 2011). In reviewing an allegation of prosecutorial misconduct, we will find that "[c]omments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and reach a fair verdict." Commonwealth v. Tedford, 960 A.2d 1, 33 (Pa. 2008).

Our review of a trial court's denial of a motion for a mistrial "is limited to determining whether the trial court abused its discretion." Commonwealth v. Fortenbaugh, 69 A.3d 191, 193 (Pa. 2013) (internal quotation marks omitted). A trial

court may grant a mistrial "only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." Commonwealth v. Simpson, 754 A.2d 1264, 1272 (Pa. 2000). A mistrial "is not necessary where cautionary instructions are adequate to overcome prejudice." Commonwealth v. Chamberlain, 30 A.3d 381, 422 (Pa. 2011).

Turning to the prosecutor's statements at issue in the instant case, we find that Appellant is not entitled to relief. First, with respect to the prosecutor's use of the word "execution," the trial court sustained counsel's objection and instructed the jury to disregard the term. As the jury is presumed to follow the court's instructions, Appellant cannot demonstrate that he was prejudiced by the prosecutor's comments in this regard. See Commonwealth v. Stokes, 839 A.2d 226, 230 (Pa. 2003). In any event, we have consistently found that a prosecutor's use of the word "execution" is not prejudicial where, as here, it accurately describes the manner in which the murder was committed. See, e.g., Commonwealth v. Freeman, 827 A.2d 385, 409 (Pa. 2003) (holding that prosecutor's characterization of murders as "executions" was "neither inaccurate nor particularly prejudicial" where the appellant, unprovoked, shot his victims in the head and face). Second, as to the prosecutor's use of the phrase "guerilla warfare," we note that the reference described *Brown's* actions, rather than Appellant's, and we agree with the Commonwealth that it was a fair description of Appellant's testimony about the alleged violent hunt for him prior to the murder. Accordingly, we find the prosecutor's comments were reasonably based on the evidence of record, did not prejudice Appellant, and, thus, the trial court did not abuse its discretion in refusing to grant a mistrial.

### E. Improper Cross-Examination

Appellant next argues that the trial court erred in refusing to grant a mistrial after the prosecutor improperly cross-examined him. Specifically, during the guilt phase of Appellant's trial, the prosecutor cross-examined Appellant regarding Bobby Harris, one of the men whom Appellant testified was present at the bar when Appellant told the group at the bar that he knew who had stolen the gun. Notably, although Appellant did not call Harris as a witness, he apparently had previously indicated that he desired to call him as a witness, and the prosecutor questioned Appellant regarding that fact as follows:

> Q: You are reading every piece of paper that the police got, correct?
>
> A: Yes.
>
> Q. One of the witnesses you want was a guy named Bobby Harris.
>
> > **[DEFENSE COUNSEL]**: Objection.
> >
> > **THE COURT**: Overruled.
> >
> > **THE WITNESS**: Yes.
>
> **BY [ASSISTANT DISTRICT ATTORNEY]**:
>
> Q. You read his statement, right?
>
> A. Yes, I read it.
>
> Q. You had the Court bring him to this building.
>
> > **[DEFENSE COUNSEL]**: Objection. Can I see you at sidebar?
> >
> > **THE COURT**: No.
> >
> > **THE WITNESS**: Yes.
>
> **BY [ASSISTANT DISTRICT ATTORNEY]**:

Q. He said that little boy said you robbed him, you took the gun. He told everybody you did it, not some guy with a beard, but you, because he knew you. Do you agree?

> **[DEFENSE COUNSEL]**: Objection. Move for a mistrial.

> **THE COURT**: Motion denied. Sustained.

Q. Did anybody accuse you, not a guy with a beard, but you [of] robbing a little boy?

A. Nobody never told me that, no.

N.T., 11/6/13, at 109-10.

At the close of examination, Appellant's counsel renewed the motion for a mistrial:

> **DEFENSE COUNSEL**: Respectfully, at this point, I renew my motion for mistrial based on several grounds. . . . [A]ll the questions that were posed about these various individuals that the defendant wanted to testify, he has no obligation to present a defense, and any references to wanting to call people or things of that sort I think is extremely prejudicial. I submit that it's inappropriate. Therefore, I renew my motion for mistrial.

Id. at 137. The trial court denied the motion, but it offered to issue a curative instruction directing the jury that a defendant is under no obligation to call witnesses and that it should disregard any questioning regarding potential witnesses. Appellant declined the trial court's offer to issue such an instruction. Id. at 137-38.

Presently, Appellant contends that the trial court should have granted a mistrial in response to the prosecutor's improper cross-examination because the questioning was irrelevant, "infest[ed] the case with blatant hearsay," and violated his right to confrontation as guaranteed by Crawford v. Washington, 541 U.S. 36, 68 (2004). Appellant's Brief at 25. While Appellant concedes that he declined the trial court's offer to issue a curative instruction, he maintains that he did so because "no instruction could

possibly cure the gross misconduct engaged in by the prosecution," and he argues that he is entitled to a new trial. Appellant's Brief at 26.

In response, the Commonwealth maintains that Appellant waived his hearsay and confrontation claims because he failed to raise them below, instead requesting a mistrial based upon his theory that the testimony implied that he had the obligation to present a defense. As to the merits of Appellant's claim, the Commonwealth argues that the first two questions to which Appellant objected — whether Harris was one of the witnesses Appellant "wanted" and whether he had the court bring him to the building — were "merely prefatory" and not prejudicial, and it points out that Appellant's remaining objection regarding Harris's statement was sustained by the trial court, thereby resulting in no prejudice. Commonwealth's Brief at 39. The Commonwealth further suggests that, because Appellant declined the trial court's offer to issue a curative instruction which would have cured any possible prejudice resulting from the prosecutor's question concerning Harris's statement, he may not now claim the trial court erred in denying his request for a mistrial.

The trial court addressed Appellant's claims on the merits. The court explained that it did not err in overruling Appellant's objection to the prosecutor's question regarding whether Appellant had wanted to call Harris as a witness because the question would have aided in rebutting Appellant's version of how the events occurred leading up to the incident. As to the prosecutor's question concerning the content of Harris's statement, the court noted that it sustained Appellant's objection and that the Commonwealth properly rephrased the question to avoid hearsay concerns. The court further opined that any possible prejudice that Appellant might have suffered as a result of the improper cross-examination could have been cured by the issuance of a cautionary instruction, which Appellant refused, but that, in any event, the jury was

previously instructed on how to treat sustained objections and any answers obtained therefrom, which the court found was "more than sufficient to guide the jury" under these circumstances. Trial Court Opinion, 12/23/14, at 22.

Despite the trial court's thoughtful analysis below, we need not reach the merits of Appellant's claims. As illustrated above, Appellant objected to the prosecutor's line of questioning on the grounds that it implied that he had an obligation to present a defense, rather than, as he now asserts, because the questioning was irrelevant, constituted hearsay, or violated his right to confront witnesses. Accordingly, Appellant's present claims are waived. See Commonwealth v. Walter, 119 A.3d 255, 264 (Pa. 2015) (finding that appellant waived her claim that the Commonwealth's cross-examination violated her right against self-incrimination because she objected to the questioning on a different basis at trial); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

## F. Slow Motion Surveillance Video Footage

Next, in a one-paragraph argument, Appellant contends that the trial court abused its discretion in allowing the prosecutor to play surveillance video footage of the murder in slow motion. As discussed in detail above, during the guilt phase of Appellant's trial, the prosecutor played the jury the carwash surveillance video, which showed the events leading up to the shooting, as well as the shooting itself. The video depicted the events in real-time, but certain portions of the footage, which were clearly marked "SLOW MOTION," were repeated in slow motion at one-tenth of the video's original speed in order to allow the jury to have a better view of Appellant's face and to draw the jury's attention to a flash coming from the gun indicating that a second gunshot had been fired. Before the prosecutor played the video, Appellant's counsel objected,

arguing that the jury should be permitted to view the video only once at its actual speed. The trial court overruled the objection, concluding that it would be a "travesty" if the prosecutor were not permitted to slow the video down to allow the jury to see what was depicted therein. N.T., 11/5/13, at 108.

Thereafter, the Commonwealth played the video one time in its entirety, and then played it a second time to allow Detective Thorsten Lucke, a Philadelphia Police Officer and expert in forensic video recovery analysis, to narrate and explain to the jury any alterations he made to the speed of the footage or the camera angles that were shown.[5] The trial court later instructed the jurors that the video was admitted into evidence "for the purpose of showing the nature of the wound received by the decedent, showing the conditions at the scene of the crime and helping [them] understand the testimony of witnesses who referred to it," and it cautioned that they "should not let [the video] stir up [their] emotions to the prejudice of the defendant." N.T., 11/7/13, at 38.

Appellant presently challenges the trial court's decision to allow the prosecutor to play the surveillance video in slow motion. Specifically, Appellant contends that, because his actions depicted in the video were not performed in slow motion, the slow motion video distorted the actual events to promote a finding of malice and premeditation, rendering the video irrelevant under Pa.R.E. 401 and unduly prejudicial under Pa.R.E. 403. As a result, Appellant maintains that he is entitled to a new trial.

By contrast, the Commonwealth maintains that the video was properly admitted. The Commonwealth emphasizes that, although slow motion video footage distorts

---

[5] The carwash surveillance system used two cameras. Detective Lucke took certain excerpts of footage from each camera and spliced them together to create the video which was shown to the jury. N.T., 11/5/13, at 104. Additionally, Detective Lucke edited part of the slow motion portion of the video to zoom in on Appellant's face. Appellant does not challenge the use of multiple camera angles in the video or the use of zooming.

reality in a sense, such video nevertheless is admissible if it will aid the jury's understanding and if it is more probative than prejudicial. Turning to the instant case, the Commonwealth explains that the slow motion video footage enhanced the jury's understanding of the events surrounding the shooting because it showed the nature of Brown's wounds and the conditions at the crime scene, and it gave the jurors a better opportunity to see Appellant's face and that he had fired two shots at Brown. The Commonwealth further asserts that the video was not prejudicial because the prosecutor initially showed the video at full speed, allowing the jury to observe the actual speed at which the crime occurred; the portions of the video shown in slow motion were clearly marked as such; and the trial court instructed the jury regarding the purposes for which the video was admitted.

Consistent with the Commonwealth's position, the trial court found that it did not err in admitting the slow motion video footage, as the video was relevant to show the nature of Brown's wound and the conditions of the crime scene; enhanced the jury's understanding of the witness' testimony regarding the shooting; and its content was not altered or distorted. Additionally, the court highlighted that it issued a cautionary instruction with regard to the video, thus alleviating any possible prejudice.

With respect to the admissibility of slow motion video into evidence, this Court has held that such representations are not prohibited, and that "the standard to be applied by the trial court is the same as it is for the admission of other evidence. It must be relevant and material and its probative value must outweigh its prejudicial impact." Commonwealth v. Jordan, 65 A.3d 318, 329 (Pa. 2013) (quoting Commonwealth v. Hindi, 631 A.2d 1341, 1345 (Pa. Super. 1993) (internal quotation marks omitted)). Thus, as with the admissibility of other types of evidence, "the admissibility of a slow-

motion videotape rests within the sound discretion of the trial court, and we will not reverse absent an abuse of discretion." Jordan, 65 A.3d at 329.

We cannot conclude that the trial court abused its discretion by admitting the slow motion surveillance video footage in the instant case. While Appellant is correct that playing portions of the video in slow motion distorted the events shown therein, we have nevertheless permitted such manipulation where it "enhance[d] the jury's understanding" and where the use of "slow motion . . . is more probative than prejudicial." Id. As the Commonwealth has highlighted herein, playing portions of the video in slow motion enhanced the jury's understanding of the events surrounding the murder by allowing it to have a better view of Appellant's face, thereby establishing Appellant's identity as the perpetrator, and by giving it the opportunity to observe that two shots had been fired from Appellant's gun, a detail which was not readily ascertainable when the video was played at normal speed. Moreover, we find that the probative value of the slow motion footage outweighed any potential for prejudice, particularly given that: the jury was first shown the scenes at normal speed, which allowed it to see the true timing of the events as they transpired; the slow motion footage was clearly marked as such; and the trial court specifically instructed the jury regarding both the purposes for which it was to consider the video footage and the fact that it should not allow the video to inflame their passions against Appellant. Accordingly, the trial court properly exercised its discretion in allowing portions of the surveillance video to be played in slow motion, and Appellant is not entitled to a new trial on this basis.

### G. Request to Individually Colloquy Jurors

In his next claim, Appellant asserts that the trial court abused its discretion in denying trial counsel's request to individually colloquy each juror regarding a newspaper article,[6] published by the *Philadelphia Inquirer* immediately before the penalty phase of his trial, which discussed the upcoming penalty phase and his criminal history. Significantly, the article referenced, *inter alia*, prior unrelated charges against Appellant for rape, robbery, and attempted murder, which were later dismissed, as well as the fact that Appellant was serving a sentence of life imprisonment in another case in which he was convicted of kidnapping, murder, and rape. On November 12, 2013, immediately before the penalty hearing commenced, Appellant's counsel brought the article to the trial court's attention during a sidebar conference and requested that the court interview the jurors individually to ensure that none of them had been influenced by the article. The trial court declined to individually colloquy the jurors, noting that it had instructed the jury on multiple occasions throughout the trial to avoid media coverage of the case and that it had no reason to believe that the jury did not follow its instructions. However, the trial court later elected to address the full jury as follows:

> **THE COURT**: Ladies and gentlemen of the jury, that will conclude the evidence for today.
>
> There is another subject I must address with the 12 of you.
>
> As you know, I have instructed you, ladies and gentlemen, on a daily basis from the start of this case that you are to avoid any outside influence. Indeed, I instructed you that the only information you may have relevant to this case is that which is offered in this courtroom in the course of the trial.

---

[6] In his brief, Appellant references multiple "articles"; however, the notes of testimony indicate that Appellant's counsel complained of only one article. <u>See</u> N.T., 11/12/13, at 12.

> To that end, specifically I instructed you to avoid watching or listening to or reading anything that might be in the media about this case.
>
> We are now at the point where I must ask all of you directly whether or not you have followed that instruction.
>
> If any of you have not followed my instruction to avoid media coverage of this case, please raise your hand.

N.T., 11/13/13, at 156-57. No juror indicated that it had failed to follow the trial court's instruction.

Appellant contends that the trial court abused its discretion in refusing to colloquy the jurors individually regarding whether the jurors had seen the newspaper article and that, as a result, he is entitled to a new trial. While Appellant notes that he does not know whether the jury was influenced by the article, he suggests that "the chances of one or more jurors having been improperly influenced are reasonable," and that such influence would have had a "catastrophic" impact on the outcome of his penalty hearing because it could have "tipped one or more jurors into voting for death." Appellant's Brief at 28.

In response, the Commonwealth maintains that Appellant waived this claim because, although Appellant's counsel initially requested that the court question each of the jurors individually about the article, he did not object when the trial court later addressed the jury as a group. In any event, the Commonwealth emphasizes that the trial court repeatedly instructed the jury to avoid media reports about the case, and that it later reminded the jury of its prior instruction and asked the jurors whether any of them failed to follow that instruction. The Commonwealth asserts that the court's decision to address the jurors collectively was consistent with this Court's precedent, and that the jury is presumed to have followed the trial court's instruction.

In its opinion below, the trial court opined that it did not err in denying Appellant's request in light of the fact that it had given the jury multiple instructions throughout the trial to avoid media accounts of this case, including daily instructions before the court recessed for lunch and before it adjourned for the evening, another instruction immediately after the jury returned its verdict, and additional instructions throughout the penalty phase. Thus, given the "repetitive and consistent nature" of its instructions, as well as the fact that the jury indicated that it had followed the instructions and was not exposed to any outside media influences, the court concluded that Appellant was not unfairly prejudiced by its decision to deny his request and, thus, is not entitled to a new trial. Trial Court Opinion, 12/23/14, at 39.

Where, as here, the potential exists for prejudicial materials to reach the jury, the trial court "must take appropriate protective action" based upon the circumstances of the case to "reasonably ensure that no prejudice will occur." Commonwealth v. Bruno, 352 A.2d 40, 51 (Pa. 1976). We review the measures that a trial court takes to guarantee that a defendant receives a fair trial "in the face of prejudicial publicity" for an abuse of discretion. Id. at 48.

In light of the fundamental rights at stake when prejudicial material is publicized during trial, we have explained that the preferred procedure under such circumstances is "to question the jurors individually, out of the presence of other jurors." Id. at 52. We recognize, however, that "questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the case." Id. This Court found such efforts to be more than sufficient in Commonwealth v. DeJesus, 880 A.2d 608 (Pa. 2005), wherein the publicity at issue consisted of only one newspaper article, and where the trial court had "affirmatively directed the jury not to read or watch

the news accounts of [the] trial" and questioned the jury as a group regarding its adherence to the instructions. Id. at 618 (internal quotation marks omitted).

Turning to the instant case, Appellant fails to demonstrate that the trial court abused its discretion in refusing to individually colloquy the jurors given its multiple instructions to the jury to avoid media coverage of the trial and its subsequent group questioning of the jurors regarding their adherence to those instructions. Indeed, as the trial court highlighted in its Rule 1925(a) opinion, the court instructed the jury to avoid media accounts of the case during its preliminary instructions; before lunch recess and evening adjournment each day; at the conclusion of the guilt phase of trial; and throughout the penalty phase of the trial. Appellant does not explain why the trial court's efforts in this regard were insufficient to avoid any prejudice from the newspaper article, particularly in light of the fact that the jury indicated that it had followed the court's instructions, albeit as a group. Moreover, Appellant overlooks that we found similar efforts by a trial court to be sufficient in DeJesus, where the trial court issued only one instruction to the jury to avoid media coverage of the case and where, as in this case, it questioned the jury as a group. Arguably, the trial court's efforts in the instant case — which included *multiple* instructions to the jury throughout trial to avoid media coverage of the case — afforded Appellant greater protection than the measures taken by the trial court in DeJesus, which we endorsed. Accordingly, we conclude the court did not abuse its discretion in refusing to colloquy the individual jurors.

## H.  Improper Testimony During Penalty Hearing

Appellant next asserts that he is entitled to a new penalty hearing as a result of the improper admission of testimony from Sam Ford, who stated that he was "robbed" by Appellant and claimed that Appellant had taken $96 from him while the two were in

prison together. N.T., 11/12/13, at 75. Although Appellant was never convicted of this offense, Appellant's counsel did not initially object to the testimony. However, during a sidebar conference the next day, Appellant's counsel indicated that Appellant had later informed him that he was never convicted of robbing Ford. In order to alleviate any possible prejudice resulting from the improperly admitted testimony, the trial court issued the following instruction:

> **THE COURT**: Good morning, ladies and gentlemen of the jury.
>
> Thank you for your patience.
>
> As you are well aware, we commenced the penalty phase of this trial yesterday and the Commonwealth presented evidence.
>
> During the presentation of the Commonwealth's case you heard evidence on the one aggravating circumstance which is relevant to this case; that is, the Commonwealth's contention that the defendant has a significant history of felony convictions involving the use or threat of violence to the person.
>
> During the course of the Commonwealth's presentation, you heard from one Samuel Ford, who told you about a strong-armed robbery allegedly committed inside the 24[th] police district here in Philadelphia on January the 10[th], 2004.
>
> I now instruct you to completely and utterly disregard that testimony as it was not properly evidenced in support of the aggravating circumstance, a significant history of felony convictions involving the use or threat of violence to the person.

N.T., 11/13/13, at 11-12.

As a result of the improper admission of Ford's testimony, Appellant submits that he should receive a new penalty hearing. While the trial court instructed the jury to

disregard the testimony, Appellant suggests that the instruction could not "sanitize" the effect of the word "robbery" on the jury, particularly given the fact that the jury was charged on the significant history of violent felonies aggravator, and robbery is widely known to be a violent felony. Appellant's Brief at 30.

The Commonwealth responds that Appellant waived this claim because his counsel waited until the next day to challenge the testimony, rather than objecting to the testimony at the time it was offered, and it asserts that the claim lacks merit in any event because the trial court instructed the jury to disregard Ford's testimony, and the jury is presumed to follow the trial court's instructions. Lastly, the Commonwealth contends that any purported error was harmless because the prosecutor presented overwhelming evidence establishing the significant history of violent felonies aggravator, including evidence of a prior murder conviction, as well as a conviction for multiple rapes and robberies. Thus, the Commonwealth offers that, even if the jury considered the improper testimony regarding the robbery, it is unlikely that the testimony would have had any impact on the jury's decision to return a death sentence.

In addressing this claim, the trial court explained that, once it was informed of the fact that Appellant had not been convicted of the robbery, it cured any possible prejudice caused by Ford's testimony by instructing the jury to disregard the testimony and any other references to it. Additionally, the court reasoned that introduction of the evidence was harmless in light of Appellant's myriad other violent felonies introduced as evidence by the Commonwealth, and, thus, it concluded that a new penalty hearing was not warranted.

We agree. As the trial court noted, upon learning that Appellant had not been convicted of robbing Ford, the court promptly and emphatically directed the jury to disregard Ford's testimony. It is well settled that the jury is presumed to follow the trial

court's instructions, Commonwealth v. Travaglia, 28 A.3d 868, 882 (Pa. 2011), and Appellant does not otherwise attempt to offer any evidence establishing that the jury failed to do so in the instant case. As a result, we need not consider, as the Commonwealth also argues, whether Ford's testimony was harmless in light of the substantial evidence regarding Appellant's prior murder conviction and multiple rape and robbery convictions also offered in support of the significant history of violent felony aggravator found by the jury.

## I. Shackling During Penalty Hearing

In his final claim, Appellant challenges the trial court's decision to shackle him during the penalty hearing. Specifically, while the jury was deliberating, Sergeant Michael Bestone of the Philadelphia Sheriff's Office advised the trial court that Appellant had been known to be aggressive towards prison officers and that the prison transportation team had observed Appellant being aggressive on the bus to the courthouse throughout the duration of his trial. Consequently, Sergeant Bestone warned that Appellant might become violent during the hearing, and he recommended that Appellant be shackled with leg irons worn underneath his clothing. N.T., 11/7/13, at 70. Appellant's counsel initially objected to the shackling, and, in response to the trial court's probing regarding the basis for his objection, asserted that he "fe[lt] [he had] to respect [Appellant's] right to be free from being shackled . . . for no reason whatsoever." Id. at 67-68. After a period of disagreement between the parties, however, Appellant's counsel abandoned his position, stating that "[i]f the sheriff's office feels [the shackling] has to be done, I don't feel I have a position one way or the other." Id. at 68. Thus, noting that "[t]here is no basis for [the] objection," the trial court overruled it. Id. at 71.

Thereafter, during a conference with the parties immediately prior to the commencement of the penalty hearing, the trial court indicated that, "for purposes of safety," and because Appellant "for reasons of his own, has decided that he wishes to be in shackles," Appellant would be placed in a one-piece leg iron worn underneath his clothing during the hearing "unless one of [the] attorneys [felt] otherwise." Id. at 73-74. Both of Appellant's counsel stated that they had "no objection." Id. at 74. The trial court then explained that it placed obstructions in front of both counsels' tables which looked like exhibits and would ensure that the jury would not see the shackles, and it asked both parties whether they had a problem with the arrangement, to which Appellant's counsel responded that they did not. Id. Appellant was then shackled and brought into the courtroom for the jury to read its verdict.

Appellant now challenges his shackling, claiming that there was "simply no good reason" for placing him in shackles in light of the fact that he sat through the guilt phase of his trial without causing any problems. Appellant's Brief at 31. Appellant further notes that the trial court ordered him to be shackled without first conducting a colloquy to determine whether he was willing to abide by courtroom rules, and that the court failed to take reasonable steps to ensure that the jury could not see the shackling. Accordingly, Appellant argues that he should receive a new penalty phase hearing.

By contrast, the Commonwealth maintains that Appellant waived this claim because, although his counsel initially objected to the shackling, he later agreed to it. In any event, the Commonwealth asserts that Appellant's claim lacks merit because Appellant had a history of violence during his incarceration, was acting aggressively while being transported to the courthouse on the day of the hearing, and the shackles were worn underneath his clothing and, thus, were not visible to the jury.

The trial court explained that it did not abuse its discretion in restraining Appellant because Appellant posed a "real and significant risk" to the "orderly administration of the remainder of his trial," and, in its view, shackling Appellant was necessary to maintain order in the courtroom. Trial Court Opinion, 12/23/13, at 56. Additionally, the court opined that Appellant was not prejudiced by its decision to restrain him because the restraint was worn underneath Appellant's clothing, permitted Appellant to sit and stand without difficulty, and was further masked by the obstructions placed in front of the counsel tables, thus rendering the restraint undetectable by the jury.

Appellant is not entitled to relief on this claim. Although Appellant's counsel initially objected to the shackling, both of Appellant's counsel later stated that they had "[n]o objection" to the shackling, and indicated that they had no problem with the court placing obstructions in front of counsel tables. N.T., 11/7/13, at 74. Thus, because Appellant's counsel ultimately acceded to the trial court's decision to shackle Appellant, we conclude that Appellant's claim is waived. Pa.R.A.P. 302(a).

## J. Statutory Review of Death Penalty Verdict

Lastly, having determined that Appellant is not entitled to relief on his claims, this Court is required pursuant to the Sentencing Code to conduct a statutory review of Appellant's death sentence. Accordingly, we must affirm Appellant's sentence unless we determine that:

> (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or
>
> (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3).

After a careful and thorough review of the record, we conclude that the sentence of death imposed by the jury was not the product of passion, prejudice, or any arbitrary factor, but, rather, was fully supported by the evidence of record. We also find that the evidence was sufficient to enable the jury to find beyond a reasonable doubt the aggravating circumstance of a significant history of violent felony convictions. 42 Pa.C.S. § 9711(d)(9). Thus, we affirm the verdict and the sentence of death imposed upon Appellant.

Judgment of sentence affirmed. Jurisdiction relinquished.

Chief Justice Saylor and Justices Baer, Donohue and Dougherty join the opinion.

Justice Wecht files a concurring opinion.