J-S33009-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| YALINA J. SANCHEZ | : | |
| | : | |
| Appellant | : | No. 1117 EDA 2016 |

Appeal from the Judgment of Sentence November 24, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0011989-2014,
CP-51-CR-0011990-2014

BEFORE:   OTT, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED AUGUST 31, 2018**

Yalina J. Sanchez appeals from the judgment of sentence at Docket Number CP-51-CR-0011989-2014 of 50 to 100 years of confinement, imposed after a jury convicted her of criminal attempt – murder; attempt, solicitation, and conspiracy to commit murder; aggravated assault; and robbery – inflict serious bodily injury.[1]  Sanchez also appeals from the judgment of sentence of life without the possibility of parole at Docket Number CP-51-CR-0011990-2014, imposed after a jury convicted her of one count each of burglary and possessing instrument of crime with intent to employ it criminally and two

---

* Former Justice specially assigned to the Superior Court.

[1]  18 Pa.C.S. §§ 901(a), 1102(c), 2702(a), and 3701(a)(1)(i), respectively.

counts each of murder; attempt, solicitation, and conspiracy to commit murder; and robbery – inflict serious bodily injury.[2]  We affirm.

The facts for both dockets are as follows:

On December 22, 2012, Yalina Sanchez, acting with her cousin Marco Sanchez and a man, known as Damir, burglarized the apartment of Anthony Fletcher, Jr. and robbed the three occupants at gunpoint.  [Yalina Sanchez] and Damir killed both Mr. Fletcher and Dwayne "Shawn" Page and also attempted to kill a third victim, Eddie Dordies, during the commission of the burglary and robberies.  The victims all suffered multiple gunshot wounds.

Marco Sanchez began having conversations with Dwayne Page around December 15, 2012 about purchasing marijuana.  N.T., 11/18/2015, at 132.  On the day of his initial conversation with Dwayne Page, [Yalina Sanchez] asked Marco Sanchez if he knew anyone from whom they could purchase marijuana.  *Id.* at 133-34.  On December 22, 2012, Marco Sanchez set up a purchase of two pounds of marijuana from Dwayne Page, to be effectuated that evening.  *Id.* 135-36.  Later that day, between the hours of two and five o'clock, [Yalina Sanchez] told Marco Sanchez that they would rob the victims of the marijuana and he agreed to the plan.  *Id.* at 137.

On the evening of December 22, 2012, Messrs. Fletcher, Page, and Dordies gathered at the Fletcher residence, 4618 Chester Avenue, Apartment 304, Philadelphia, to effectuate the sale of two pounds of marijuana to Marco Sanchez.  *Id.* at 6-15, 131.  The plan called for Marco Sanchez to take delivery of the marijuana at Mr. Fletcher's apartment.  Before his arrival, Marco Sanchez advised the sellers that he would be bringing an additional person with him.  *Id.* at 14.  Marco Sanchez, a Hispanic male, entered the apartment with Damir, an African-American male.  *Id.* at 16.  Shortly thereafter, [Yalina Sanchez] arrived.  The victims did not know that [Yalina Sanchez] and Marco Sanchez were cousins, and she was introduced to them as his girlfriend.  *Id.* at 17-18.

_____

[2]  18 Pa.C.S. §§ 3502(a)(1), 907(a), 2502, 1102(c), and 3701(a)(1)(i), respectively.

- 2 -

Once [Yalina Sanchez] and her accomplices were inside Mr. Fletcher's small apartment, the marijuana was displayed and the parties discussed the drug deal. *Id.* at 18-20, 24, 28-29, 149-50. Messrs. Dordies and Page were standing in the kitchen with Marco Sanchez and Damir, while Mr. Fletcher and [Yalina Sanchez] were in the living room. *Id.* [Yalina Sanchez] was unfamiliar to Mr. Dordies, and he became curious about her. In order to closely observe her, he walked from the kitchen to the bathroom and passed [Yalina Sanchez] along the way. *Id.* at 20-21. As he returned to the kitchen from the bathroom, Mr. Dordies was shot in his face by Damir. *Id.* at 19-20. [Yalina Sanchez] and Damir then shot Messrs. Fletcher and Page. *Id.* 21-22. Mr. Fletcher was shot multiple times in the living room as he attempted to escape. *Id.* at 21-22, 24-25, 154-55. Messrs. Page and Dordies were shot as they stood in the kitchen. *Id.* at 19, 22-23, 25, 155-56.

Mr. Dordies, who was still standing after being shot in his face, was shot again by Damir. *Id.* at 22. This bullet struck him in his shoulder and he fell to the floor. *Id.* Damir then fired three more times, striking Mr. Dordies twice. *Id.* At this point, Marco Sanchez and [Yalina Sanchez] fled the scene with much of the marijuana. *Id.* at 25-26 [(Dordies's testimony)]. Damir's firearm locked and he moved to pistolwhip Mr. Dordies, who fought back. *Id.* at 23. Damir then fled. *Id.* Mr. Dordies found a phone and called 911 operators. *Id.* at 23, 27-28.

Around 10:20 p.m. on December 22, 2012, police officers received a report of a person with a gun and two male victims shot inside Apartment 304 at 4618 Chester Avenue, Philadelphia. N.T., 11/17/2015, at 15-16. Upon arrival, officers were granted entry by a resident. *Id.* at 15-18. Once inside the building, the officers attempted to enter Apartment 304. They noticed a bullet hole and fresh blood on the door. As one officer kicked the door in, it pushed back because 33 year-old Anthony Fletcher's dead body lay behind it. *Id.* at 18-20.

Dr. Samuel Gulino, the Chief Medical Examiner of Philadelphia testified that Mr. Fletcher was shot three times on the night of December 22, 2012. *Id.* at 170. One bullet went through the back of his head and, into his brain. *Id.* A second bullet hit the right back section of his scalp. *Id.* at 172. A third bullet struck Mr. Fletcher in the central part of his back. *Id.* at 173. The two different caliber bullets recovered from Mr. Fletcher's body showed he was shot by two different firearms. *Id.* at 175.

Dr. Gulino testified, to a reasonable degree of medical certainty, that Mr. Fletcher's cause of death was multiple gunshot wounds and that the manner of his death was homicide. *Id.* at 170, 175-76, 183-84.

Inside the apartment, officers found 29 year-old Dwayne Page "laying on his back . . . shot in his face area." Although Mr. Page's eyes were shut and he was unresponsive, "[h]e was actually breathing and . . . gargling." *Id.* 20-21, 64. "Mr. Page . . . sounded like he was choking on his own blood." *Id.* at 49. Officers took Mr. Page out of the apartment building on a stretcher and transported him to the Hospital of the University of Pennsylvania. *Id.* 64-65. Doctors pronounced Mr. Page brain-dead inside the operating room on the evening of December 23, 2012. *Id.* at 67, 176-77.

Dr. Gulino testified that Mr. Page was shot three or four times. *Id.* at 177. One bullet went through the right side of his neck and up into his brain. *Id.* at 178-79. Another bullet went through his face, into his upper jaw, and down and out the roof of his mouth, becoming lodged in right front side of his neck. *Id.* at 179-80. A third bullet went into his abdominal cavity and became lodged there. *Id.* at 180-81. A fourth bullet went through his right shoulder; this may have been a reentry wound from the bullet that went through the right side of his neck and up into his brain. *Id.* at 180. The fact that two different caliber bullets were recovered from Mr. Page's body shows he was shot by two different firearms. *Id.* at 181-82. Dr. Gulino also testified, to a reasonable degree of scientific and medical certainty, that the cause of Mr. Page's death was multiple gunshot wounds and that the manner of his death was homicide. *Id.* at 177, 183-84.

The Police Department's Firearms Identification Unit and Crime Scene Unit provided additional ballistics evidence, including the caliber of firearms used to kill Anthony Fletcher and Dwayne Page. Crime Scene Unit Officer Lamont Fox testified that recovered both .380 caliber and .25 caliber fired cartridge casings inside the apartment. *Id.* at 128-29. His unit recovered seven .380 automatic fired cartridge casings and six .25 automatic fired cartridge casings. *Id.* at 129. Five .25 fired cartridge casings and two .380 fired cartridge casings were recovered from the living room. *Id.* at 131. One more .25 fired cartridge casing was recovered from the entry way between the kitchen and the living room. Four .380 fired cartridge casings were found in the kitchen and one was in vestibule and bathroom area. *Id.* Officer

- 4 -

Norman DeFields of the Firearms Identification Unit testified that all six .25 fired cartridge casings came from the same firearm. *Id.* at 199-200. He also testified that all seven .380 fired cartridge casings came from the same firearm. *Id.* at 201.

The first officers on the scene found the floor of the apartment littered with loose marijuana and observed a digital scale on the kitchen table. *Id.* at 24, 50. Meanwhile, as more officers gathered outside the building, Eddie Dordies exited the apartment by way of a fire escape so as not to reencounter [Yalina Sanchez] and her accomplices. *Id.* at 28-29, 76. Mr. Dordies emerged from a small alleyway next to the building and approached the group of officers, including Officer Daniel Mitchell. *Id.* at 77. He told Officer Mitchell that he and his friends had been shot inside one of the apartments. Officer Mitchell observed that Mr. Dordies had been shot in the face and chest. *Id.* at 78. However, Mr. Dordies was unarmed, and no firearm was found in the small alleyway he used to escape the perpetrators. *Id.* at 103. Mr. Dordies stated that the perpetrators were an African-American male, a Hispanic male, and an African-American female with a "caramel complexion[,] [a]pproximately 23 to 27 years-old with a gray hoody and her hair pinned to her head." *Id.* at 79, 81, 84-85.

. . . .

[During trial,] Marco Sanchez . . . testified that he and [Yalina Sanchez] planned the robbery. *Id.* at 135-40. Additionally, Marco Sanchez testified that he and [Yalina Sanchez] escaped the apartment after the robbery and shooting and retreated to [Yalina Sanchez]'s residence with the stolen marijuana. *Id.* at 157-58. As they escaped, [Yalina Sanchez] told Marco Sanchez to "chill, chill." *Id.* at 157. Once the two reached [Yalina Sanchez]'s residence, [she] retired to her living room . . . while Marco sat on her couch. *Id.* at 158.

Trial Court Opinion, 5/15/2017, at 2-7, 23.

Prior to closing argument, the trial court instructed the jury:

You must keep in mind . . . that you are not bound by the attorneys' recollection of the evidence. Indeed, it is your recollection of the evidence and yours alone which must guide you during your deliberations.

- 5 -

> If there is a discrepancy between an attorney's recollection and your own, you are bound by your recollection of the evidence, nor are you limited, ladies and gentlemen of the jury, in your consideration of the evidence to that which is mentioned by these attorneys.

N.T., 11/19/2015, at 78.

During closing argument, the Commonwealth made the following statement:

> I will sit down in two minutes, but as I thought of what I was going to say to you all, this sort of horrific and disgusting imagine [sic] was going through my head, and it's not even that Anthony Fletcher lay dead in his living room floor while Shawn was carried to [the Hospital of the] U[niversity of] Penn[sylvania]. That's not the image I'm talking about.

> It's that after this happened, after these two young men lost their lives on the streets of Philadelphia, the defendant goes home and sat on the couch and smoked the weed like who cares while these families had to get that phone call.

*Id.* at 142-143. Yalina Sanchez objected to these comments and moved for a mistrial, but the trial court denied the motion. *Id.* at 144, 148.

A jury convicted Yalina Sanchez on November 24, 2015, and she was sentenced that same day. Trial Court Opinion, 5/15/2017, at 1. This appeal followed.[3]

Yalina Sanchez now raises the following issue on appeal:

> Did the [trial] court abuse its discretion by denying [Yalina Sanchez]'s motion for a mistrial where the prosecutor made up evidence that [Yalina Sanchez] was smoking stolen

---

[3] On April 6, 2016, the trial court ordered Yalina Sanchez to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) within 21 days of the date of the order. On April 27, 2016, Yalina Sanchez complied. On May 15, 2017, the trial court filed a responsive opinion pursuant to Pa.R.A.P. 1925(a).

marijuana following the crimes while the victims' families learned about the deaths of their loved ones?

Yalina Sanchez's Brief at 5.

Yalina Sanchez contends that "the prosecutor committed misconduct during closing argument by referring [to] the existence of evidence without any basis whatsoever in the record." *Id.* at 10. Yalina Sanchez challenges the Commonwealth's statement about the image "going through" its "head" that Yalina Sanchez was sitting on the couch smoking marijuana while the victims' families received telephone calls about their deaths. *Id.* (citing N.T., 11/19/2015, at 142-143). Yalina Sanchez maintains that "[t]his argument concerning [her] supposed post-incident conduct had no basis in the record." *Id.*

"Our review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion." *Commonwealth v. Cash*, 137 A.3d 1262, 1273 (Pa. 2016) (citation and internal quotation marks omitted), *cert. denied*, 137 S. Ct. 1202 (2017).

> In reviewing an assertion of prosecutorial misconduct, our inquiry centers on whether the defendant was deprived of a fair trial, not deprived of a perfect trial. It is well-settled that a prosecutor must be free to present his or her arguments with logical force and vigor. Comments grounded upon the evidence or reasonable inferences therefrom are not objectionable, nor are comments that constitute oratorical flair. Furthermore, the prosecution must be permitted to respond to defense counsel's arguments. Consequently, this Court has permitted vigorous prosecutorial advocacy provided that there is a reasonable basis in the record for the prosecutor's comments. A prosecutor's remarks do not constitute reversible error unless their unavoidable effect would prejudice the jurors, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence

objectively and render a true verdict. Finally, we review the allegedly improper remarks in the context of the closing argument as a whole.

***Commonwealth v. Sneed***, 45 A.3d 1096, 1109–1110 (Pa. 2012) (quotation marks, brackets, and citations omitted).

"A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice." ***Commonwealth v. Chamberlain***, 30 A.3d 381, 422 (Pa. 2011). "[T]he jury is presumed to follow the court's instructions." ***Commonwealth v. Jemison***, 98 A.3d 1254, 1263 (Pa. 2014).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Sandy L.V. Byrd, we conclude that Yalina Sanchez's challenge merits no relief. We agree with the trial court that the Commonwealth's "reference to the victims' families was not impermissible and was exceedingly brief[.]" Trial Court Opinion, 5/15/2017, at 22. "[R]eview[ing] the allegedly improper remarks in the context of the closing argument as a whole[,]" we are also unconvinced that three sentences during the Commonwealth's lengthy closing argument could have "prejudice[d] the jurors" to such an extent that they "form[ed] in their minds fixed bias and hostility toward [Yalina Sanchez] so that they could not weigh the evidence objectively and render a true verdict." ***Sneed***, 45 A.3d at 1110; ***see also*** Trial Court Opinion, 5/15/2017, at 23.

Additionally, the Commonwealth's comment had a "reasonable basis in the record[.]" ***Sneed***, 45 A.3d at 1110. Dordies testified that Marco and Yalina Sanchez fled from Fletcher's residence with marijuana. Trial Court

Opinion, 5/15/2017, at 3, *citing* N.T., 11/18/2015, at 25-26. Marco Sanchez testified he and Yalina Sanchez planned the robbery with the aim of stealing marijuana from the victims, and that, immediately after committing the crimes, he and Yalina Sanchez went to her living room with the marijuana, where she told him to "chill," before entering her living room, while he sat on her couch. *Id.* at 2, 6-7, 23 *citing* N.T., 11/18/2015, at 135-140, 157-158. Accordingly, the Commonwealth's comments about Yalina Sanchez going directly home with the marijuana stolen from the victims after shooting them were "grounded upon the evidence," and, although Marco Sanchez did not explicitly testify that Yalina Sanchez smoked the marijuana in her living room, we concur with the trial court that this addition "constitute[d]" permissible "oratorical flair," **Sneed**, 45 A.3d at 1110, in order to convey Yalina Sanchez's "relaxed attitude about the incident." Trial Court Opinion, 5/15/2017, at 23.[4]

Furthermore, the trial court instructed the jury that statements by attorneys do not constitute evidence. N.T., 11/19/2015, at 78. As noted above, a "jury is presumed to follow the court's instructions." **See Jemison**, 98 A.3d at 1263. The mistrial requested by Yalina Sanchez was not necessary, because this cautionary instruction was given, thereby adequately overcoming

---

[4] Also, as the trial court notes, the Commonwealth "did not state that [Yalina Sanchez] said 'who cares.' The prosecutor [merely] said he had an image in his head[.]" Trial Court Opinion, 5/15/2017, at 23. The Commonwealth's rhetoric was therefore again intended to convey Yalina Sanchez's apathy and composure after the murders and not meant to be accepted as a direct quotation.

any potential prejudice. ***See Chamberlain***, 30 A.3d at 422; N.T., 11/19/2015, at 144.

For these reasons, the trial court did not abuse its discretion by denying Yalina Sanchez's motion for a mistrial based upon prosecutorial misconduct. ***See Cash***, 137 A.3d at 1273. We therefore affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/18