J-A09043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                             :         PENNSYLVANIA
                             :
            v.               :
                             :
                             :
LAWRENCE CRAWLEY             :
                             :
          Appellant          :   No. 1188 EDA 2021

Appeal from the Judgment of Sentence Entered May 3, 2021
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0007759-2018

BEFORE:  NICHOLS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:              **FILED APRIL 21, 2022**

Lawrence Crawley (Crawley) appeals the judgment of sentence entered

in the Court of Common Pleas of Montgomery County (trial court).  Following

a jury trial, Crawley was convicted of first-degree murder and four other

counts related to a fatal attack on his ex-girlfriend, Angela Stith, a 33-year-

old mother of three children.  As to the murder count, Crawley was sentenced

to a prison term of life without parole, and the sentences on the remaining

counts were imposed consecutively.  Crawley filed post-sentence motions

which were denied.  In this appeal, Crawley now claims that the trial court

erroneously denied a jury charge on the offense of voluntary manslaughter;

the verdict on the murder count is against the weight of the evidence; and the

_____

[*] Retired Senior Judge assigned to the Superior Court.

trial court ignored relevant sentencing factors, resulting in a manifestly excessive sentence. We affirm.

**I.**

The trial court has summarized the relevant facts adduced at the three-day murder trial as follows:

> On Friday, August 3, 2018, at approximately 2:30 am, Whitemarsh Township Police Officers responded to Vector Security, located at 5125 Campus Drive, in Whitemarsh Township, Montgomery County, Pennsylvania, less than 5 minutes after receiving a 911 call of a woman being stabbed and run over by a vehicle. Upon arrival, the officers learned from multiple eye witnesses and surveillance footage, of [Crawley's] terrifying and vicious attack on his ex-girlfriend, Angela (Maya) Stith ("Ms. Stith,") in the parking lot of Vector Security where she worked. The evidence revealed that [Crawley] stalked and planned days in advance to murder Ms. Stith which he did with a depravity that defies characterization.
>
> Just two weeks before, [Crawley] pleaded guilty before a District Justice in Danville, Pennsylvania to assaulting Ms. Stith. Starting a week after he pleaded, [Crawley] stalked Ms. Stith up until the time he murdered her. Ms. Stith's friend and neighbor, Kevin Alston ("Mr. Alston"), testified that between approximately 10:00 pm on July 25, 2018, and 2:00 am, on July 26, 2018, he observed [Crawley] pacing back and forth from around the corner to the front of Ms. Stith's door. At trial, the Commonwealth introduced corroborating cell phone records reflecting that [Crawley's] cell phone was in the vicinity of Ms. Stith's apartment from 12:12 am until 2:44 am on July 26, 2018. At trial, Mr. Alston read aloud the following text message that Ms. Stith had shared with him. It was a text message that Ms. Stith had sent to [Crawley] on Friday, July 27, 2018, at 6:43 am:
>
> > You told me in Danville that you would leave me alone if that's what I wanted. I've asked you repeatedly to do that. I will get a restraining order against you & make sure the harassment charges stick with more than a fine to pay. Leave me alone, stop contacting me, [don't] come to my house, [don't] ride by, stay away from me[.]

At trial, Mr. Alston also testified that, aside from seeing [Crawley's] shadowy figure, pacing outside Ms. Stith's apartment on July 26, 2018, he had an encounter with [Crawley] who confronted him at approximately 7:00 am on July 31, 2018, outside of the local convenience store down the street from Ms. Stith's apartment. Cell phone evidence introduced at trial corroborated [Crawley's] presence outside Ms. Stith's apartment at 12:39 am, from 12:51 am until 1:08am, and then again, at 7:18 am, 7:51 am, 7:26 am until 9:00 am. After telling Mr. Alston that he had just seen Mr. Alston exit Ms. Stith's apartment, [Crawley] interrogated him about whether Mr. Alston was romantically involved with Ms. Stith.

Officer Brian Walsh ("Ofc. Walsh") of the Philadelphia Police Department recalled Ms. Stith being distraught and nervous upon his arrival to her home at 5009 Germantown Avenue, Philadelphia, on July 31, 2018, at approximately 8:00 pm, after receiving a call for a domestic incident. Ms. Stith reported that [Crawley], who was living about 20 minutes away at the time, had cracked the windshield of her 2002 red Toyota Solara. Cell phone evidence introduced at trial corroborated [Crawley's] contact with and presence at Ms. Stith's residence that evening[.] That same cell phone evidence also reflected that whether or not Ms. Stith was aware, [Crawley] was in the vicinity of the same Philadelphia AMC movie theater on Broad Street, where Ms. Stith had reported being earlier in the evening accompanied by another individual and her children; and that he traveled back to the area of Ms. Stith's apartment, before returning to his mother's home, at 807 North 13th Street in Philadelphia, where he resided. Before leaving the scene, Ofc. Walsh, in conformity with standard police protocol, advised Ms. Stith on the procedure to file for protection from abuse.

Even more telling than these prior stalking incidents, the evidence revealed the extraordinary measures [Crawley] took in his attempt to buy a handgun less than 12 (twelve) hours before the murder. More specifically, on August 2, 2018, at 1:30 pm, [Crawley] completed an application to purchase a 9mm Smith & Wesson semiautomatic pistol, but was denied when authorities learned that he lied on the application. [Crawley] had driven hours earlier that same day to Delia's Gun Shop, located at 6104 Torresdale Avenue, in Philadelphia. Upon arrival at approximately 11:41 am, [Crawley] solicited the assistance of David Reid ("Mr.

Reid,") a longtime gun shop employee, and stated he was looking for a handgun. Mr. Reid ultimately advised [Crawley] that the Florida driver's license he presented was insufficient under Pennsylvania law which requires a purchaser to possess a valid Pennsylvania driver's license or I.D., reflecting his or her current address. At 11:48 am, surveillance footage from that day reflects [Crawley] exiting the shop, after Mr. Reid watched him type into his cell phone the local PennDOT address that Mr. Reid gave him[.] [Crawley] returned to the shop at approximately 1:18 pm, having secured the requisite ID after a trip to PennDOT, and tried again to purchase a 9mm Smith & Wesson semiautomatic pistol[.] [Crawley] went so far as to lie on the U.S. Department of Justice Alcohol, Tobacco, Firearms and Explosives (ATF) application, by denying on that questionnaire that he ever had any prior convictions for domestic violence. [Crawley] was unsuccessful in his attempt to purchase the gun, however, as the form Mr. Reid submitted for the requisite approval to consummate the sale, was denied by the Pennsylvania State Police.

At trial, Montgomery County Detective William R. Mitchell, Jr. ("Det. Mitchell, Jr.") testified at length as to the abundant evidence collected and analyzed, reflecting among other things, that [Crawley] had returned home on the evening of August 2, 2018, and repeatedly called and texted Ms. Stith from his Samsung Galaxy 7 Edge cell phone. Hours later, [Crawley] left his home, wearing a dark blue hooded sweatshirt, despite the heat, the hood of which he later pulled up over his head to conceal his face. Equipped with a wooden claw hammer, and two (2) knives, in addition to duct tape detectives discovered in his car, [Crawley] drove from Philadelphia to Whitemarsh Township, where he knew Ms. Stith was working. Cell phone evidence introduced at trial, reflected that [Crawley] and Ms. Stith communicated through text and phone calls in the late evening hours of August 2, 2018, and the early morning hours of August 3, 2018, and likewise permitted law enforcement to trace [Crawley's] movements in those hours.

More specifically, when [Crawley] called Ms. Stith at 10:15 pm, his phone was using a cell phone tower in the vicinity of his residence in Philadelphia. [Crawley's] use of the phone precluded any determination as to its location from 10:15 pm until 2:12 am, when his phone pinged off of the cell phone tower closest to Vector Security, .4 miles from the site of the homicide. Based on the evidence provided, the jury could reasonably infer that [Crawley]

was lying in wait in the parking lot outside Vector Security from 2:12 am until his attack that morning at 2:23 am. Surveillance video captured Ms. Stith exiting the building's rear door at approximately 2:13 am, holding what appears to be an illuminated cell phone up to her ear as she walks towards her car, entering her driver's side door. At 2:15 am, [Crawley] placed a call to Ms. Stith, that lasted approximately six (6) minutes, twenty-four (4) seconds; and, at 2:21 am, he immediately called her again but she did not answer. At approximately 2:24 am, Ms. Stith runs from her car with [Crawley] in pursuit.

Sometime before 2:24 am, [Crawley] snuck up on Ms. Stith, while she was seated in her car during her break, and pounded on her driver side window with a hammer until it shattered, at which point he reached inside her car in an attempt to stab and/or grab her as she tried desperately to get away by climbing out a passenger side door. Montgomery County Detective Edward Schikel ("Det. Schikel") testified as to the blood found on the center console, passenger side window, door locks and handle of Ms. Stith's car. Video surveillance captured [Crawley] chasing and then tackling Ms. Stith to the ground at approximately 2:25 am, stabbing her four (4) times with such force that, ultimately, with his final blow, he plunged the knife ten (10) inches into her body, diagonally down through her ribs, pierced her lung, and broke off the handle of the knife, leaving the blade in her back[.] Only when her co-workers, Nadirah Muhammad ("Ms. Muhammad") and Kyle Stewart ("Mr. Stewart,") horrified by what they observed on nearby surveillance cameras, ran out the building's backdoor, at approximately 2:25 am, yelling to scare [Crawley] off and render help to Ms. Stith, did [Crawley] halt his attack, stand up, throw the knife he was holding onto the ground, and run; looking back at them as he reached the edge of the parking lot. It was then that they realized Ms. Stith, who was covered in blood from being stabbed by [Crawley] was not getting up and Ms. Muhammad immediately called 911 at 2:26 am.

As Mr. Stewart knelt by Ms. Stith, lying on her side, she told him both that she had been stabbed by [Crawley], who she identified, and she could feel the knife still lodged in her back . . . Ms. Stith was bleeding profusely, and the fingers on one of her hands appeared to be broken, so Mr. Stewart ran inside the building to get the first aid kit and whatever supplies he could find to help her until the paramedics arrived, while Ms. Muhammad still on the phone with the 911 dispatch operators, stayed by her side. It was

- 5 -

then that Ms. Muhammad looked up to see [Crawley's] Chevy Avalanche truck pulling around the side of the building, before stopping for a second, and then "floor" the accelerator of his vehicle, careening towards them, crushing Ms. Stith. [Crawley] repeatedly drove over Ms. Stith a total of four (4) times; driving completely around the building several times and then making quick turns back and forth, so that her co-workers could not render aid or help her. When, at one point, Mr. Stewart did attempt to move Ms. Stith to safety, [Crawley] swerved his truck menacingly towards him forcing Mr. Stewart to jump from the macadam parking lot to a grassy area nearby, before [Crawley] righted his path back over Ms. Stith the fourth (4th) time; before fleeing the scene. Det. Schikel testified as to the carnage [Crawley] left behind, and the blood, fluid, teeth, hair, and tissue of the mother of three that was found spread some 45 feet throughout the length of the parking lot . . . Pennsylvania Troopers ultimately apprehended [Crawley] on the Pennsylvania Turnpike four (4) hours later some 200 miles away on the other side of the state, in Somerset County.

Trial Court Opinion, 10/6/2021, at 1-7 (footnotes omitted).

After his attack on Stith, Crawley quickly drove away and a high-speed chase with police ensued. Crawley's attempt to evade the police caused him at one point to drive the wrong way up a highway on-ramp. The chase ultimately ended with Crawley setting himself ablaze and crashing his vehicle into the Allegheny Tunnel. As police removed Crawley from the wreckage and arrested him, he told them that "voices in [his head] made [him] kill [Stith]." Trial Transcript, 1/15/2020, at p. 60.

Crawley survived his burns and injuries from the crash and was charged with Count One (First-Degree Murder); Count Two (Third-Degree Murder); Count Three (Possession of an Instrument of Crime); Count Four (Possession of A Firearm/Other Weapon With Intent); Count Five (Giving a False Written

- 6 -

Statement); and Count Six (Unsworn Falsification to Authorities). The jury found Crawley guilty of all charges except Count Two.

Following a sentencing hearing on May 3, 2021, the trial court imposed a mandatory prison term of life without parole as to the first-degree murder count. This life term was made consecutive to the sentences imposed as to the other four counts: 2.5 to 5 years as to Count Three; 2.5 to 5 years as to Count Four; 3.5 to 7 years as to Count Five; and 6 to 12 months as to Count Six. The aggregate sentence was a term of life, followed by a prison term of 9-18 years. The trial court had the benefit of a presentence investigation report prior to the imposition of these sentences.

In his post-sentence motions, Crawley argued that his conviction of first-degree murder was inconsistent with the weight of the evidence which, according to Crawley, proved that he acted in the heat of passion rather than with premeditation, an element of first-degree murder. He also challenged the discretionary aspects of the sentences imposed as to the other four counts, asserting that they were excessive, resulting from the trial court's failure to consider relevant sentencing factors such as his military commendations, his combat-related mental health issues and his difficult upbringing.

The trial court denied the post-sentence motions and Crawley timely appealed, raising three issues in his appellate brief:

> I. Did the trial court err in denying [Crawley's] request for a jury charge on the offense of voluntary manslaughter when the evidence showed that the killing in question occurred in a fit of

rage that followed a heated argument between [Crawley] and the victim?

II. Was the jury's verdict against the weight of the evidence since the killing in question was not carefully planned or executed, but rather occurred during an irrational fit of rage?

III. Was the trial court's imposition of consecutive sentences at counts 3, 4, 5, and 6 that exceeded even the aggravated range of the sentencing guidelines for those offenses manifestly excessive in that such a sentence failed to adequately consider [Crawley's] military record, his exposure to untreated trauma in the military, his efforts as a father, and his difficult and abusive childhood and instead focused exclusively on the facts of the case?

Appellant's Brief, at 3 (suggested answers omitted).

## II.

Crawley's first claim is that the trial court erroneously denied a jury charge on the offense of involuntary manslaughter. He contends that a new trial is needed to remedy this error because the jury had no opportunity to convict him of this lesser offense of first-degree murder.

Voluntary manslaughter is defined as a killing without lawful justification, but done while the offender "is acting under a sudden and intense passion resulting from serious provocation" by the victim or an intended victim. *See* 18 Pa.C.S. § 2503. An instruction on voluntary manslaughter may be granted "only where the offense is at issue and the evidence would support such a verdict." *Commonwealth v. Cash*, 137 A.3d 1262, 1271-72 (Pa. 2016) (quoting *Commonwealth v. Sanchez*, 82 A.3d 943, 979 (Pa. 2013)); *see also Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009)).

- 8 -

The test for serious provocation is "whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection." *Montalvo*, 986 A.2d at 100 (quoting *Commonwealth v. McCusker*, 292 A.2d 286, 290 (Pa. 1972)). "[T]he passage of time between [the] provocation and the 'passion' must be viewed as a cooling-off period, and killings will not be deemed to have occurred under the heat of passion where there was sufficient time for cooling-off between whatever provocation might have existed and the actual killings." *Commonwealth v. Mason*, 130 A.3d 601, 629 (Pa. 2015).

A trial court's denial of a jury charge is reviewed for an abuse of discretion or an error of law which could have affected the outcome of the proceedings:

> A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue.
>
> A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.
>
> The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Brown*, 911 A.2d 576, 582-83 (Pa. Super. 2006) (citations omitted).

Here, Crawley argues that the evidence justified an instruction on voluntary manslaughter because he was sufficiently provoked by his interactions with Stith prior to her murder. In support of that claim, Crawley relies primarily on two cases, **Commonwealth v. Harris**, 372 A.2d 757 (Pa. 1977), and **Commonwealth v. Voytko**, 503 A.2d 20 (Pa. Super. 1986), neither of which are analogous to the present facts.

In **Harris**, our Supreme Court held that the trial court erred in denying a voluntary manslaughter instruction because there was evidence which supported a jury finding that the defendant killed the victim in response to provocation. **See Harris**, 372 A.2d at 758-59. The defendant had established that the victim struck him in the head with a cane immediately following a failed drug purchase. The defendant then drew a knife he always carried with him and stabbed the victim several times. If accepted as true by the jury, these circumstances would show that the defendant was provoked by the victim before stabbing him, and that he did so without a cooling-off period. A voluntary manslaughter instruction was, therefore, warranted. **See id**.

In **Voytko**, this Court held that the jury received an inadequate instruction on voluntary manslaughter because the trial court did not explain how a serious provocation may be based on "the cumulative effect of a series of related events." 503 A.2d at 23. There, the defendant had confronted his spouse as she arrived at her parents' home, having been driven there by the

victim, her paramour. The defendant became enraged, started screaming, and then fatally shot the victim in the head.

Prior to the shooting, the defendant had "found his wife in an act of adultery with [the victim], had physically fought with [the victim], had argued with his wife, had been deserted by his wife, and finally, had found her in [the victim's] company, returning from a date, at 5:00 a.m." *Id*. at 23. A new trial was mandated because the "trial court's instructions did not at any time or in any manner tell the jury" it could consider whether all of those circumstances could have satisfied the serious provocation element of voluntary manslaughter. *Id*.

These cases are distinguishable from the present matter. It was undisputed at trial that Crawley had stalked and assaulted Stith prior to the murder, and that he had attempted to buy a gun hours before he eventually stabbed her and ran her over with a truck. Crawley had also laid in wait in the parking lot of Stith's place of work after arming himself with two knives, duct tape and a hammer used to break into her vehicle. There is no evidence that Stith did or said anything to Crawley that would rise to the level of a serious provocation. Furthermore, unlike in **Harris** or **Voytko**, Crawley's

attack was planned and then brutally carried out despite opportunities for Crawley to give Stith a chance of survival.[1]

Accordingly, there was no evidence that Crawley was seriously provoked or that he reacted to a provocation without an intervening cooling-off period. Since the record did not support a finding that Crawley "became impassioned to the extent that his mind was incapable of cool reflection," the trial court acted within its discretion in denying a voluntary manslaughter instruction. **Cash**, 137 A.3d at 1271. Thus, the denial of the jury charge must be upheld.

**III.**

Similar to his first claim, Crawley asserts in his second appellate ground that the trial court abused its discretion in denying his post-sentence motion challenging the weight of the evidence because his lack of premeditation should have precluded the first-degree murder conviction. Specifically, Crawley argues that his attack on Stith was sparked by two prior phone calls he had with her, upsetting him to the point that he developed a sudden and intense passion at the time of Stith's murder. He emphasizes further that the attack was so senseless, violent and public in nature that it must have been

_____

[1] At trial, Crawley had argued that a voluntary manslaughter instruction was supported by evidence that he and Stith had been in a heated argument on the phone the night of the attack. However, the trial court correctly noted in its opinion that this evidence could not support the requested instruction because the content of the calls in question was never introduced and, thus, there was no evidence of sufficient provocation to justify the requested instruction. **See** Trial Court Opinion, 10/6/2021, at 13-15.

the product of a fit of rage rather than a coordinated or premeditated plan to kill Stith.

When ruling on a weight of the evidence claim in a post-sentence motion, the trial court sits as the finder of fact "who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Olsen*, 82 A.3d 1041, 1049 (Pa. Super. 2013). "The trial court will only award a new trial when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Ramtahal*, 33 A.3d 602, 609 (Pa. 2011).

On review of a trial court's ruling as to a weight of evidence claim, this Court may only determine whether the trial court abused its discretion, "not the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Smith*, 985 A.2d 886, 888 (Pa. 2009). An abuse of discretion is found where "the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id*.

Here, we find that the trial court did not abuse its discretion in denying the weight of evidence claim in Crawley's post-sentence motion challenging the jury's verdict on the first-degree murder charge.

The offense of first-degree murder may be proven with evidence of "an intentional killing," carried out "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). The statute does not, as Crawley suggests, require careful

planning, careful execution, rational behavior or any effort to avoid detection or culpability. *See id*.

As summarized in the trial court's opinion, there was abundant evidence that both supported the jury's finding that Crawley acted with premeditation. Again, it was undisputed that Crawley had assaulted and stalked Stith prior to the murder, and that he had attempted to buy a gun hours before he eventually stabbed her and ran her over with a truck. Crawley had also laid in wait in the parking lot of Stith's place of work after arming himself with two knives, duct tape and a hammer, which he used to break into Stith's vehicle.

Crawley's conduct in initially leaving the scene and then returning to repeatedly run Stith over with his truck further refutes the claim that he lacked specific intent to cause Stith's death. The trial court concluded that this evidence made the jury's finding of specific intent to kill "nearly unavoidable," resulting in a verdict that "in no way shocks the conscience." *Id*. at 11.

We note, too, that Crawley's arguments concerning a lack of premeditation are unpersuasive. In his brief, he refers to phone calls he had with Stith the night of the murder, suggesting that he acted in the heat of passion after those upsetting conversations, which purportedly concerned Stith's failed or aborted pregnancies and Crawley's career prospects.

However, the record does not support the contention that the fatal attack was somehow prompted by those calls.[2] The first call started at about 10:15 p.m. and lasted about 18 minutes, ending several hours before the attack later that evening at 2:23 a.m. The second call started at about 2:15 a.m. and lasted only about six minutes. There was no trial testimony or other evidence concerning the content of the two conversations, much less evidence that could possibly refute the evidence of premeditation. In fact, Crawley has himself undermined his present appellate claim by stating at the sentencing hearing that he was motivated by anger to attack Stith, but "*not* anger through phone calls[.]" Trial Transcript, 5/3/2021, at p. 22 (emphasis added). Thus, the trial court correctly determined that the two phone calls are of no moment here. *See* Trial Court Opinion, 10/6/2021, at 14-16.

Crawley's next contention is that the murder could not have been premeditated because it was carried out in such a violent and unsophisticated manner, ensuring that he would be apprehended. As evidence of his unstable emotional state, Crawley notes that he had used much more force than

_____

[2] Crawley's argument that these phone calls provoked him into an irrational and excessively violent attack is germane to his related claim that he was entitled to a voluntary manslaughter instruction. However, Crawley's reference to those two calls is unavailing with respect to both the weight of evidence claim and the jury charge claim because the content of those calls was not adduced at trial.

necessary to kill Stith, and that he then set himself on fire after fleeing from the police.

Although it cannot be doubted that Crawley was emotionally disturbed when he attacked Stith and then inflicted injuries on himself, those facts do not preclude a conviction for first-degree murder as the offense is defined in 18 Pa.C.S. § 2502(a) and (d). As discussed above, the intent element of the offense may be proven by evidence that the defendant was "lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). The elements of premeditation and intent to kill do not require careful planning, an attempt to avoid culpability, or the absence of remorse after the fact, *see id*., and we have found no legal authority that supports Crawley's contrary position. Thus, on these facts, the trial court did not abuse its discretion in denying Crawley's weight of evidence claim.

**IV.**

Crawley's final claim on appeal is that he is entitled to resentencing as to the four non-homicide offenses because the maximum terms he received on those courts were above the standard guidelines range, and the trial court did not consider certain mandatory sentencing factors. As these issues turn on discretionary aspects of the sentence, their merits may only be considered if Crawley satisfied the procedural requirements for asserting such claims.

"The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal."

***Commonwealth v. Buterbaugh***, 91 A.3d 1247, 1265 (Pa. Super. 2014).  An

appellant may invoke this Court's jurisdiction to consider the merits of such

claims if four elements are met:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

***Commonwealth v. Baker***, 72 A.3d 652, 662 (Pa. Super. 2013) (citations

omitted).

Additionally, Pa.R.A.P. 2119(f) sets forth briefing requirements for

raising discretionary aspects of a sentence on appeal:

> An appellant . . . shall set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence.   The statement shall immediately precede the argument on the merits with respect to the discretionary aspects of sentence.

Pa.R.A.P. 2119(f).

Rule 2119(f) requires that the concise statement contain a "plausible

argument."  ***Commonwealth v. Goggins***, 748 A.2d 721, 727 (Pa. Super.

2000).   The concise statement must specify "where the sentence falls in

relation to the sentence guidelines and what particular provision of the code

it violates." ***Id***.  The statement must also indicate which "fundamental norm

the sentence violates and the manner in which it violates that norm." ***Id***.  If

these requirements are met, then this Court can decide whether a substantial

question exits.  ***See id***.   It is well established that claims involving an

excessive sentence, based on the imposition of consecutive terms, may raise a substantial question if it is shown why the sentence is unreasonable. ***See Commonwealth v. Dodge***, 77 A.3d 1263, 1270 (Pa. 2013); ***see also Commonwealth v. Moury***, 992 A.2d 162, 171–72 (Pa. Super. 2010) ("The imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.").

In this case, Crawley has satisfied all of the prerequisites for challenging the discretionary aspects of his sentence. He has preserved his claim in a post-sentence motion, a Rule 1925(b) statement, and a Rule 2119(f) statement. A timely notice of appeal was filed, and Crawley has cited legal authority in support of his claims that his sentence was excessive and that the trial court ignored relevant sentencing factors. This Court may, therefore, consider the merits of those claims.[3]

First, we find that the trial court did not err with respect to consideration of relevant sentencing factors. Crawley contends that the trial court focused too heavily on the details of the murder, without taking into account his military record, the trauma he experienced during his military service, and his difficult childhood. The record refutes this claim.

---

[3] The Commonwealth does not dispute that Crawley has adequately asserted his claims concerning the discretionary aspects of his sentence.

The trial court expressly indicated at sentencing that it had reviewed the information in the presentence investigation report, as well as "the statement made by the defendant, and arguments of counsel." Trial Transcript, 5/3/2021, at p. 38. As a matter of law, then, the trial court is presumed to have sentenced Crawley after due consideration of the relevant mitigating statutory factors. *See Commonwealth v. Fowler*, 893 A.2d 758, 766-67 (Pa. Super. 2006) (where a presentencing investigation report has been submitted, "it will be presumed [that the trial judge] was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.").

Second, we find that the trial court did not err with respect to the length of Crawley's sentences or the decision to impose them consecutively. Although the sentences on the non-homicide offenses exceeded the standard guidelines range, they were all within the statutory maximum terms. The decision to impose these sentences consecutively was also within the trial court's authority – especially in light of the brutal nature of Stith's murder – and we find no abuse of the trial court's sentencing discretion in that regard.

Judgment of sentence affirmed.

Judge Sullivan joins the memorandum.

Judge Nichols concurs in the result.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date:* _4/21/2022_