J-S41043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
:           PENNSYLVANIA
:
v.               :
:
:
CHAD GOLDSBOROUGH            :
:
Appellant       :   No. 768 MDA 2022

Appeal from the Judgment of Sentence Entered April 20, 2022
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0001286-2021

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: FEBRUARY 3, 2023**

Appellant, Chad Goldsborough, appeals from the judgment of sentence entered in the Court of Common Pleas of Berks County after a jury found him guilty of robbery and the trial court found him guilty of summary harassment. Herein, Appellant raises claims challenging the sufficiency and weight of the evidence, and he argues that the trial court erred in failing to provide notice and the opportunity to be heard when it entered an order amending his original sentencing order to correct a mistaken Recidivism Risk Reduction Incentive ("RRRI") program[1] eligibility designation.  After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 61 Pa.C.S.A. §§ 4501-4512.

The trial court's Pa.R.A.P. 1925(a) opinion sets forth the pertinent facts and procedural history, as follows:

Chad Goldsborough ("Appellant") was charged [by Information filed on May 6, 2021] with Robbery, Theft by Unlawful Taking or Disposition, and a summary charge of Harassment. The charges stemmed from a February 26, 2021, incident alleged to have occurred at 931 North 8th Street, in Reading, Berks County.

The case went to trial on March 9, 2022, at which the Commonwealth first called Officer Eric Koller of the Reading Police Department, who testified that on February 29, 2020, he was on patrol when he was dispatched to 931 North 8th Street . . . where a notary shop was located ("the Notary Shop") to assist another officer—Officer Sanchez—with downloading video from a surveillance system. *Id.* at 55-56. Officer Koller stated that he had to verify the correct date and time stamp on the video because it was incorrect on the system, but that he was able to determine the correct time and date of the video surveillance footage and reviewed and collected the footage for evidence. *Id.* at 56-57. On cross-examination, Officer Koller acknowledged that the video footage that was collected did not include any audio from the surveillance camera. *Id*. at 58.

Officer Sandy Enrique Sanchez, also of the Reading Police Department, testified that on the same day, he was dispatched to the Notary Shop where he spoke with Bayron Soto-Lucha, ("[Soto-Lucha]"). *Id.* at 59. Officer Sanchez was present when Officer Koller downloaded the video footage from the surveillance system and reviewed the footage from the five cameras stationed inside and outside of the Notary Shop from the date of the incident, which occurred on February 26, 2021. *Id.* at 61-62.

[Soto-Lucha] next testified that in February of 2021, he was living in Reading . . . with his wife and two children. *Id.* at 64. On the morning of February 26, 2021, [Soto-Lucha], who worked in construction, went to a job installing a door, where he received $675.00 in currency. *Id*. at 65. At the time, [Soto-Lucha] owned a 1992 Toyota Celica ("the Vehicle") . . . that [he kept at a garage and advertised for sale for $1,200.00] through Facebook. . . . *Id.* at 66.

At approximately 11:30 a.m. on February 26, [[Soto-Lucha]] received a phone call from a prospective buyer, who told [Soto-Lucha] that he wanted to see the Vehicle but that he did not have a ride to get there. *Id.* at 67. [Soto-Lucha] said that he was already out in his truck, and he offered to pick up the prospective buyer. *Id*. [Soto-Lucha] then drove to a house on Orange Street, which was the address he was provided, and picked up the prospective buyer, later identified as Appellant, and his wife. *Id*.

They then drove to the garage where Appellant test-drive [*sic*] the Vehicle, and [they] came to an agreement for Appellant to purchase the Vehicle for $900.00. *Id*. [Soto-Lucha] note[d] that Appellant took his cell phone out and said that he was going to purchase insurance for the Vehicle. *Id*. at 68. [Soto-Lucha] further mentioned that Appellant did not show him any cash. *Id*.

[Soto-Lucha], Appellant, and Appellant's wife then traveled to the Notary Shop on 8th Street for the title transfer, during which [Soto-Lucha] told Appellant that he would need to have the money in exchange for the title transfer at the Notary Shop. *Id*. Upon arriving at the Notary Shop, Appellant showed the notary his cell phone, which he alleged displayed insurance information; however, the notary would not accept the insurance. *Id*. at 69-70. [Soto-Lucha] likewise reaffirmed to Appellant that he would not transfer the title until he had the money for the Vehicle. *Id*. at 70.

[Soto-Lucha] described Appellant as becoming "very annoyed and . . . moving around from here to there and saying that he [Appellant] didn't understand and that [Soto-Lucha] had to do it." *Id*. Appellant then began to argue with [Soto-Lucha], but [Soto-Lucha] became embarrassed and left, walking to a nearby garage/gas station. *Id*. [Soto-Lucha] testified that he was afraid that Appellant "might want to assault [him]." *Id*.

[Soto-Lucha] returned to the Notary Shop, because the title was still inside, where Appellant continued to argue with him. *Id*. at 71, 73. As they left the Notary Shop and went outside, Appellant continued to argue. *Id*. at 71. Appellant, described as still being "very upset", then told [Soto-Lucha] that if he would not transfer the title, then [Soto-Lucha] would have to pay Appellant "for the day's work that he had lost for him and his wife and for the insurance as well." *Id*.

[Soto-Lucha] stated that he wanted to leave, but that he could not do so because Appellant's belongings were still in [Soto-Lucha's] truck. *Id.* at 72. Appellant told [Soto-Lucha], "I know where you live, you have to give me this money or you're going to see what's going to happen." *Id*. [Soto-Lucha] testified that Appellant then took out his cell phone, showed [Soto-Lucha] a photograph of [Soto-Lucha's] uncle on Facebook, stating that "he's going to pay, too," and continued saying "I'm going to kill you, kill you." *Id.* at 72, 90. [Soto-Lucha] stated that he was afraid that Appellant was going to kill him, and possibly his wife and kids. *Id*. at 75.

Appellant made a phone call and a black car pulled up to the parking lot and another man step[ped] out of the car, walked over to [Soto-Lucha], and told [Soto-Lucha] that he had to give Appellant the money. *Id*. [Soto-Lucha] described this third person as a taller white male with a teardrop tattoo near his eye. *Id.* at 77. Both Appellant and this third person moved ever closer to [Soto-Lucha]. *Id.* at 73-74. Fearing that harm might come to him or his family, [Soto-Lucha] pulled out his wallet and gave the money inside to Appellant, which, according to [Soto-Lucha], was approximately $700.00. *Id.* at 72-75.

Appellant continued to follow [Soto-Lucha] back to his truck and demanded more money. *Id.* at 76. [Soto-Lucha] then drove off in his truck and Appellant got into the third person's car and followed [Soto-Lucha] for about three blocks. *Id.* at 76-77. [Soto-Lucha] was scared and did not initially report the incident to law enforcement, but a friend convinced him to do so two days later. *Id.* at 78.

During [Soto-Lucha's] testimony, the Commonwealth played the video recording extracted by Officer Koller from the surveillance cameras at the Notary Shop. *Id.* at 79-84; Comm.'s Ex. 2. [Soto-Lucha] provide some narration of the events depicted in the video through questions from the assistant district attorney. *Id*.

On cross-examination, [Soto-Lucha], who was using the services of an interpreter at trial, acknowledged that he was a native Spanish-speaker and that he only spoke limited English. *Id***.** at 85. [Soto-Lucha] clarified that he was paid $675 for the door job earlier in the day, but that he had some money already in his wallet. *Id*. [Soto-Lucha] further admitted that he did not provide

a receipt, or have a copy of such, for the work that he performed. *Id.* at 86.

[Soto-Lucha] indicated that he and Appellant had agreed that Appellant would pay [Soto-Lucha] the money for the vehicle prior to the title transfer. *Id.* at 88-89. However, they would record the transaction as a free transfer, so that [Soto-Lucha] would not have to pay taxes on the transaction. *Id*.

When asked about the vehicle and its title, [Soto-Lucha] admitted that his name was not on the title but testified that he had been given the vehicle in exchange for some work that he had performed. *Id*. at 86-87. Moreover, the transfer between the previous owner and [Soto-Lucha] was a recorded transaction through a notary. *Id.* at 92. [Soto-Lucha] further stated that he had disclosed this fact to Appellant. *Id.* at 87.

The Commonwealth recalled Officer Sanchez who reviewed some still screenshots from the surveillance video. *Id.* at 94. Officer Sanchez testified that law enforcement had attempted to identify the third person who arrived in the black car, but that they could not because the license plate was too blurry to identify the number. *Id.* at 95.

On cross-examination, and upon reviewing his report, Officer Sanchez noted that [Soto-Lucha] told him that Appellant threatened to kill him, but that he did not include that detail in his report. *Id.* at 97-98. The Commonwealth then entered video footage from officer Sanchez's body-worn camera of the interview he conducted with [Soto-Lucha]. *Id.* at 99-100; Comm.'s Ex. 6. During a review of the body-worn camera footage, Officer Sanchez explained that [Soto-Lucha] used language in Spanish that Officer Sanchez interpreted as meaning that Appellant threatened [Soto-Lucha]'s life. *Id.* at 100. On recross-examination, Officer Sanchez admitted that [Soto-Lucha] had stated, in English, that Appellant threatened to "kick" [[Soto-Lucha]'s] ass." *Id.* at 100-01. Officer Sanchez further conceded that [Soto-Lucha] initially provided him a value of money in his wallet to be between $600.00 and $1,000.00, but that [Soto-Lucha] later gave the $700.00 figure after giving it some thought. *Id.* at 101.

Christa Johnson, Appellant's fiancé, testified that on February 26, 2021, Appellant contacted a person selling the vehicle through Facebook, and then he and [Soto-Lucha] exchanged text

messages and spoke on the phone once or twice before [Soto-Lucha] arrived to pick Appellant and Ms. Johnson up to see the vehicle. *Id.* at 106-07. They first traveled to an alleyway in a garage where Appellant looked at the vehicle and decided that he wanted to purchase it. *Id.* at 108. They then traveled to a Wawa, where Appellant got the money for the Vehicle, and Ms. Johnson ordered insurance for the vehicle on her cell phone. *Id*. Ms. Johnson described purchasing the insurance through the Progressive Insurance website, which the cost came to about $80.00, and then receiving a confirmation *via* email. *Id.* at 108-09, 114. She stated that she believed Appellant later received documentation in the regular mail for the insurance. *Id.* at 109. Defense Counsel, Sean Fitzgerald, Esq., then entered an insurance document into evidence, which Ms. Johnson identified as the declarations page from Progressive Insurance indicating that Appellant had to remove the vehicle from the insurance because Appellant did not purchase the vehicle. Id. at 109-10; Def.'s Ex. 1. Ms. Johnson testified that because Appellant did not purchase the vehicle, he had to switch the insurance to another vehicle that was purchased from Ms. Johnson's mother. *Id.* at 110.

Ms. Johnson then described arriving at the Notary Shop, and while they were still in [Soto-Lucha]'s truck, [Soto-Lucha] was asking for the money for the vehicle. *Id.* at 111. When they entered the Notary Shop, Ms. Johnson showed the employee her phone, which had the insurance information displayed. *Id.* at 113. Ms. Johnson stated that the Notary Shop employee did not speak English, so [Soto-Lucha] told Appellant that he could not do the title transfer until after Appellant paid [Soto-Lucha]. *Id.* at 113. As Appellant and [Soto-Lucha] continued to debate, Ms. Johnson told Appellant that she did not think that they should go through with the transaction because she felt "like we're going to get ripped off," and that "[i]t all just seems sketchy." *Id.* at 114.

When Appellant, Ms. Johnson, and [Soto-Lucha] left the Notary Shop, they continued to talk in the parking lot. *Id.* at 115. Ms. Johnson testified that she did not hear Appellant make any threats to [Soto-Lucha], but that she left during the conversation to give them space. *Id.* at 116. At some point, Appellant called his friend for another ride, and a black vehicle arrived. *Id.* According to Ms. Johnson, when the friend arrived, he did not make any threats or act in an intimidating manner. *Id.* at 117.

On cross-examination, Ms. Johnson identified Appellant's friend as Jay Antonini, who came in the black vehicle to pick the couple up after the failed transaction. *Id.* at 118. Ms. Johnson stated that [Soto-Lucha] had agreed to reimburse Appellant for the insurance costs and that was what he was handing over to Appellant in the video footage. *Id.* at 118-119.

At the conclusion of the trial on March 10, 2022, the jury found Appellant guilty of Robbery and not guilty of Theft by Unlawful Taking or Disposition. [The trial] court likewise found Appellant guilty of the summary charge of harassment. The same day, [the trial] court sentenced Appellant on the robbery conviction to a term of five to ten years of incarceration in a state correctional facility, with a $300.00 fine for the harassment conviction. At the time, we found that Appellant was eligible for the Recidivism Risk Reduction Incentive (RRRI) program.

On March 11, 2022, the Commonwealth filed a post-sentence motion seeking to modify the sentencing order [] to make Appellant not RRRI eligible because of the robbery conviction. On March 21, 2022, Appellant, through Defense Counsel, filed post-sentence motions challenging both the sufficiency and weight of the evidence. By order dated March 23, 2022, [the trial court] directed that the parties file briefs in support of their respective positions as to Appellant's RRRI eligibility. Both Defense Counsel and the Commonwealth agreed in their filed briefs that Appellant was not RRRI eligible. No hearing was thereafter held. On April 19, 2022, [the trial court] entered two separate orders—one granting the Commonwealth's motion and the other denying Appellant's motion. [The trial court, therefore,] entered an amended sentencing order indicating that Appellant was not RRRI eligible by statute.

On May 17, 2022, Appellant filed a Notice of Appeal with the Superior Court. [The trial] court, on May 19, 2022, entered an order directing Appellant to file a Concise Statement of Matters Complained of on Appeal on June 1, 2022, in which he sought review on the following issues:

1. The Commonwealth failed to present sufficient evidence to establish a conviction for Robbery when no threat was made.

2. The Commonwealth failed to present sufficient evidence to establish a conviction for Robbery when no theft was attempted or committed.

3. [Appellant]'s conviction for Robbery was against the weight of the evidence when no credible testimony was presented that [Appellant] threatened the Victim with or intentionally put the Victim in fear of immediate serious bodily injury.

4. [Appellant]'s conviction for Robbery was against the weight of the evidence when no credible testimony was presented that there was an attempt to take any money or that any money was taken in the course of committing a theft.

5. The trial court erred when it entered an amended sentencing order making [Appellant] RRRI ineligible without [Appellant] being present to the hearing.

Appellant's Concise [Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b)].

Trial Court Opinion pursuant to Pa.R.A.P. 1925(a), filed July 18, 2022, at 1-7.

In Appellant's brief, which largely tracks his Rule 1925(b) statement, he begins by challenging the sufficiency of the evidence offered to prove he committed the crime of robbery as defined under 18 Pa.C.S. § 3701, *infra*. We set forth our standard of review for a challenge to the sufficiency of the evidence, as follows:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno***, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact

finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. **Moreno, supra** at 136.

**Commonwealth v. Koch**, 39 A.3d 996, 1001 (Pa. Super. 2011).

In Appellant's first sufficiency issue, he argues that he neither threatened Soto-Lucha with, nor placed him in fear of, immediate serious bodily injury, while in his second issue, he maintains that the Commonwealth failed to prove he directed such alleged threats and actions as part of a course of committing a theft. After careful review, we find no merit to his arguments.

Appellant challenges his conviction for robbery under 18 Pa.C.S. § 3701(a)(1)(ii).

> To sustain a conviction for first-degree robbery under [s]ection 3701(a)(1)(ii), the Commonwealth must establish that "in the course of committing a theft," the defendant "threatens another with or intentionally puts him in fear of immediate serious bodily injury." 18 Pa.C.S.[ ] § 3701(a)(1)(ii). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S.[ ] § 3701(a)(2).
>
> A conviction under [s]ection 3701(a)(1)(ii) is contingent upon the type of bodily harm threatened. **See Commonwealth v. Ross**, 570 A.2d 86, 87 ([Pa. Super.] 1990) (evidence sufficient to show appellant, by the use of an upraised knife, threatened the victim with serious bodily injury), *appeal denied*, 593 A.2d 417 ([Pa.] 1990). The Commonwealth need not prove a verbal utterance or threat to sustain a conviction under [s]ection 3701(a)(1)(ii). **Commonwealth v. Hopkins**, 747 A.2d 910, 914 (Pa. Super. 2000) (citations and quotation marks omitted). It is sufficient if the evidence demonstrates aggressive actions that threatened the victim's safety. **Id**. For the purposes of [s]ection 3701(a)(1)(ii), the proper focus is on the nature of the threat posed by an assailant and whether he reasonably placed a victim in fear of "immediate serious bodily injury." **Id.** (citations omitted). Thus,

a reviewing court will consider the defendant's intent and actions and not necessarily the subjective state of mind of the victim. ***Commonwealth v. Rodriquez***, 673 A.2d 962, 966 ([Pa. Super.] 1996); ***see Commonwealth v. Nelson***, 582 A.2d 1115, 1118 ([Pa. Super.] 1990) ("The fact that the threat may not have produced the intended fear is irrelevant."), *appeal denied*, 593 A.2d 840 ([Pa.] 1991); ***see also Commonwealth v. Mays***, 375 A.2d 116, 117-18 ([Pa. Super.] 1977) (noting that it is irrelevant that the victim may not have taken the threat seriously).

***Commonwealth v. Ouch***, 199 A.3d 918, 923–24 (Pa. Super. 2018).

As discussed above, the Commonwealth introduced evidence that Appellant reacted to both the notary's rejection of his insurance proffer and Soto-Lucha's consequential refusal to transfer title by threatening Soto-Lucha with immediate bodily harm if Soto-Lucha did not compensate him for his and his wife's alleged lost wages and auto insurance costs. According to Soto-Lucha, a "very upset" Appellant said he knew Soto-Lucha's address, displayed a cell phone photograph to show he also knew where Soto-Lucha's uncle lived, and promised that both Soto-Lucha and his uncle "would see what's going to happen" unless he received payment as demanded. N.T. at 71-72. Soto-Lucha asked why Appellant could not do what was necessary to complete the transfer of title, but Appellant, while placing a call on his cell phone, insisted he would kill Soto-Lucha if the cash payment was not made. N.T. at 72, 90.

Just moments after Appellant completed the cell phone call, an apparent associate of his, described by Soto-Lucha as a tall, white man with a teardrop tattoo near his eye, arrived by car. N.T. at 72-74, 77. This other man joined Appellant, and the two walked right up to Soto-Lucha and positioned themselves "very close" to him, where the other man warned, "you have to

do what he's [Appellant's] telling you, you have to give [Appellant] the money." N.T. at 72. At this point, Soto-Lucha testified, "I felt like they were going to kill me." N.T. at 75. Fearing imminent serious harm, Soto-Lucha paid Appellant approximately $700 cash, and shortly thereafter handed over the remainder of what he possessed in his wallet after Appellant demanded he do so. N.T. at 72-74, 76. Soto-Lucha testified, "People like that, you know, bad people, you feel like you almost have to pay." N.T. at 76.

Officer Sandy Enrique Sanchez of the Reading Police Department testified that he interviewed Soto-Lucha and took down his statement two days later outside of the Notary Shop. N.T. at 97. The officer indicated Soto-Lucha was nervous and "jumping around" when recounting the incident between himself and Appellant, and the officer described making "many attempts to try to calm [Soto-Lucha] down[]" during the interview. *Id*.

On cross-examination, Officer Sanchez testified that Soto-Lucha reported Appellant had threated to kill him during their February 26th encounter, even though the officer acknowledged he failed to include this accusation in his written report. N.T. at 98. On redirect, the Commonwealth played a 25-minute-long video of the interview recorded on Officer Sanchez's body-worn camera, after which Officer Sanchez underscored that Soto-Lucha had used the Spanish word, "dano", during the interview to refer to how Appellant allegedly had threatened him. N.T. at 99-100. According to the officer, "dano" is a vague term meaning "I want to do harm to a person, he wants to do harm to me." The officer testified that he understood the term

- 11 -

as Soto-Lucha used it to mean Appellant had threatened his life. N.T. 100. On cross-examination, Officer Sanchez acknowledged that Soto-Lucha also said that Appellant threatened to "kick my [Soto-Lucha's] ass." N.T. 100-101.

The instant facts as presented by the Commonwealth and accepted by the finder of fact were sufficient to prove that Appellant threatened, or intended to put Soto-Lucha in reasonable fear of, immediate serious bodily injury as required to prove robbery under section 3701(a)(1)(ii). Soto-Lucha testified that Appellant angrily demanded money and said to him, "I'm gonna kill you", as he was dialing someone on his cell phone. Just a moment after the call, an associate of Appellant's arrived and joined Appellant in a unified show of force, as the two walked right up to Soto-Lucha and told him that he needed to pay Appellant immediately. Soto-Lucha believed at that moment that he was in danger of serious bodily harm or worse unless he met Appellant's demands. Officer Sanchez testified that he understood Soto-Lucha to mean as much during their interview two days later when Soto-Lucha used the Spanish language term "dano" to describe what Appellant had said to him.

Any show of force directed to a person while committing a theft, whether actual or constructive, brings that act within the scope of the Crimes Code's robbery provision. *Commonwealth v. Duffey*, 548 A.2d 1178, 1182 (Pa. 1988). Threats to kill a victim support a fact-finder's conclusion that a defendant intentionally placed a victim in fear of immediate serious bodily injury. *Commonwealth v. Matthew*, 909 A.2d 1254, 1259 (Pa. 2006).

The evidence introduced at Appellant's criminal trial demonstrated that he employed both intimidating actions and threats to seriously harm or kill Soto-Lucha. When viewed in the light most favorable to the Commonwealth as verdict winner, such evidence was sufficient to prove the necessary element of Section 3701(a)(1)(ii) that the defendant had placed the victim in reasonable fear of immediate serious bodily injury to accomplish the underlying theft. *See also Commonwealth v. Mullen*, No. 640 MDA 2022, 2022 WL 17588521, at *5 (Pa. Super. Ct. Dec. 13, 2022) (holding evidence of defendant's threats to kill victim sufficed to establish element that theft was enabled by placing victim in fear of immediate bodily injury).[2]

Appellant's closely related, second sufficiency claim challenges the Commonwealth's evidence offered to prove that he committed the underlying theft against Soto-Lucha. To support his argument that he neither committed nor attempted a theft of Soto-Lucha, Appellant points to the trial testimony of his girlfriend, eyewitness Christa Johnson, who maintained that Mr. Soto-Lucha willingly paid Appellant to cover the costs associated with both the insurance Appellant had secured in vain and the lost wages for that day. N.T. at 108-09. However, this portion of Appellant's argument pitting Johnson's testimony against Soto-Lucha's testimony goes to the weight, rather than to

---

[2] While *Mullen* is not controlling because it is a non-published memorandum, it nevertheless provides persuasive authority to this Court. *See* Pa.R.A.P. 126(b) (providing that unpublished nonprecedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

the sufficiency, of the evidence and is therefore of no avail to him in arguing this issue. ***See Commonwealth v. Edwards***, 229 A.3d 298, 306 (Pa. Super. 2020) (citation omitted) (recognizing that "a challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes that the Commonwealth has produced sufficient evidence of each element of the crime, but questions which evidence is to be believed.").

The remainder of Appellant's sufficiency argument is appropriately directed and is two-fold. First, Appellant contends that because the jury acquitted him of the separate charge of theft by unlawful taking, his robbery conviction, which depends upon proof of an underlying theft, cannot stand. It is well-settled, however, that the occurrence of an inconsistent verdict, alone, provides no ground for overturning a conviction because the inconsistency is simply understood as an act of the jury's lenity:

> Consistency in verdicts in criminal cases is not necessary. ***Commonwealth v. Strand***, 464 Pa. 544, 347 A.2d 675 (1975). This Court has stated, "When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon [the] acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity." ***Commonwealth v. Lloyd***, 376 Pa.Super. 188, 191, 545 A.2d 890, 892 (1988), *appeal denied,* 522 Pa. 602, 562 A.2d 825 (1989) (quoting ***Commonwealth v. Shaffer***, 279 Pa.Super 18, 420 A.2d 722 (1980) (citations omitted)) (jury's acquittal of appellant of theft charge and conviction of robbery charge did not entitle appellant to any relief). Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is evidence to support the verdict. ***Commonwealth v.***

> **Boyles**, 407 Pa.Super. 343, 595 A.2d 1180 (1991), *appeal denied,* 531 Pa. 651, 613 A.2d 556 (1992).

**Commonwealth v. Swann**, 128, 635 A.2d 1103, 1104–05 (Pa. Super. 1994).

Second, Appellant asserts that the surveillance video played at trial proved that no theft occurred, as it depicted Soto-Lucha pulling money out of his wallet and handing it to Appellant without either physical contact between them or any "struggle" over the contents of the wallet. Brief for Appellant at 30. This argument fails to address, let alone disprove, the Commonwealth's case that what occurred was a robbery accomplished not by the physical taking of Soto-Lucha's money but by threatening, or intending to place Soto-Lucha in immediate fear of incurring, immediate serious bodily harm.

At trial, the Commonwealth presented evidence that Appellant threatened and intimidated Soto-Lucha for the sole purpose of unlawfully confiscating all the money Soto-Lucha carried on his person. Indeed, the facts recounted *supra* established that Appellant's demand for reimbursement of alleged lost wages and auto insurance expenses was made not in earnest but, instead, as the planned culmination of a con.

It was undisputed that Appellant, alone, frustrated the sale of and transfer of title to the vehicle by presenting invalid auto insurance to the notary and making no attempt thereafter to remedy the matter and complete the transaction as Soto-Lucha was asking him to do. Instead, he turned on Soto-Lucha, aggressively insisted Soto-Lucha "reimburse" him, and eventually, with the aid of an accomplice who arrived right when summoned,

extracted money from Soto-Lucha with the aid of death threats and acts of intimidation.

The testimony of Soto-Lucha in this regard, therefore, was entirely consistent with, and hardly disproven by, the surveillance video depiction of a transfer of money completed without a physical struggle. Accordingly, we discern no merit to Appellant's sufficiency argument.

In Appellant's next issue, he challenges the weight of the evidence admitted on the robbery charge. Our standard of review for such a claim is as follows:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis and citations omitted); *see also Commonwealth v. Cash*, 137 A.3d 1262, 1270 (Pa. 2016) (stating that "in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.") (citation and internal quotation marks omitted). Additionally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part,

or none of the evidence. ***Commonwealth v. Rivera***, 983 A.2d 767, 771 (Pa. Super. 2009).

Appellant contends that evidence of Soto-Lucha's statements made during his interview with Officer Sanchez undermined the credibility of his trial testimony regarding the level of threat made and the amount of money taken. Specifically, he alludes to Soto-Lucha's use of the broad term "dano" to describe to Officer Sanchez what Appellant had threatened, and he declares the term is too imprecise to prove that immediate serious bodily injury was implicated. He also argues that the conflict between Soto-Lucha's initial loss estimate of between $600 and $1,000 cash and the final figure of $700 reached after giving it more thought further shows the unreliability of Soto-Lucha's accusation.

Also bearing negatively on Soto-Lucha's veracity, Appellant continues, were Soto-Lucha's two-day delay in calling authorities about his alleged robbery and his inability to recall for Officer Sanchez where he performed the carpentry work for which he received this cash payment just two days earlier.

In the trial court's responsive Pa.R.A.P. 1925(a) opinion, it sets forth relevant evidence and legal authority, and it explains that it denied Appellant's post-sentence motion raising this claim after having determined the jury reached a sound guilty verdict based on a finding of fact that Soto-Lucha credibly testified about his encounter with Appellant. ***See*** Trial Court Opinion, 7/18/22, at 9-11. Specifically, the trial court observes that the jury viewed

- 17 -

all Commonwealth and Defense witnesses testify under direct examination and rigorous cross-examination,[3] watched both the surveillance video depicting the actions leading up to Soto-Lucha's relinquishment of $700 cash to Appellant and the video of Soto-Lucha's interview taken from Officer Sanchez's body-worn camera, and considered Appellant's arguments offered in impeachment of Soto-Lucha before it deemed credible Soto-Lucha's account of the alleged robbery.

Under our standard of review, it is not the function of this Court to substitute its judgment for that of the finder of fact on matters of witness credibility and weight of the evidence, and we will not grant a new trial absent a verdict that is so contrary to the evidence as to shock one's sense of justice. Presented with no such verdict in the instant case, we discern no abuse of the trial court's discretion in denying Appellant's weight of the evidence challenge. *See*, *e.g.*, *In the Interest of C.S.*, 63 A.3d 351, 358 (Pa. Super. 2013) (holding that the juvenile court properly exercised its discretion in rejecting the juvenile's weight of the evidence challenge to her adjudication of delinquency for robbery, where (1) the victim, a convenience store clerk, testified that the juvenile stole items from the store after threatening the clerk that a nearby friend of the juvenile possessed a gun; and (2) the juvenile

---

[3] During the testimony of Defense witness Christa Johnson, the jury learned that she had two prior convictions for retail theft and received instruction that it could consider this criminal history as bearing on her credibility as a witness. N.T. at 122-23.

court found the clerk's testimony to be credible); *see also Commonwealth v. Brawner*, 553 A.2d 458, 462 (Pa. Super. 1989) (stating that the trial court properly rejected the defendant's weight of the evidence challenge to his robbery conviction, where the purported contradictions in the testimony of the victim alleged by defendant were minor and did not undermine the propriety of the jury's guilty verdict).

In Appellant's final issue, he contends the trial court erred when it filed an amended sentencing order to correct the original sentencing order's patently mistaken designation of Appellant as RRRI-eligible without first scheduling a hearing "to afford [Appellant] the opportunity to respond to the amended sentencing [and] be informed of the basis for the change, the impact on his minimum sentence, and his eligibility for parole." Brief of Appellant at 32. We disagree.

The failure to conduct a hearing, Appellant posits, violated the notice requirements of Section 5505 of the Judicial Code, "Modification of Orders", which provides as follows:

> Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed.

42 Pa.C.S. § 5505.

Appellant devotes the remainder of his argument claiming that his case comes squarely under this Court's decision in *Commonwealth v. Blair*, 230

A.3d 1274 (Pa. Super. 2020), in which we discussed both the notice requirement of Section 5505 and a defendant's due process rights of notice and the opportunity to respond during the sentencing phase:

> Even if there is a clear mistake [in the trial court's sentencing order], that does not relieve the court of its obligation to give notice as required by 42 Pa.C.S. § 5505 to both the defendant and the district attorney of the proposed changes and an opportunity to respond to those changes. Not only is such a notice required by 42 Pa.C.S. § 5505, the sentencing process must also satisfy due process, which similarly requires a notice and opportunity to respond.

*Blair*, 230 A.3d at 1277.

The present facts are distinguishable from those in *Blair*. In *Blair*, the trial court received a letter from the Pennsylvania Department of Corrections (DOC) advising that Blair was not entitled to the entire time credit that the court applied to his sentence because the DOC had already applied a portion of the credit to a different sentence. Without giving to Blair either notice or an opportunity to respond, the trial court entered an order amending its sentence to reduce the amount of credit awarded for time served. The order directed that all other provisions of the sentencing disposition remained in full force and effect.

Accordingly, Blair argued in his *nunc pro tunc* direct appeal that the trial court erred in amending judgment of sentence to reduce his time credit without first providing notice and holding a hearing in his presence on the time credit issue. *Id.* at 1276. Determining that Blair had been denied both Section 5505 notice and his due process right to be afforded the opportunity

to respond, we vacated Blair's sentence and remanded for further proceedings. *Id.* at 1277.

Here, in contrast, Appellant received both notice of, and an opportunity to be heard on, the proposed change to the original sentencing order's incorrect designation of RRRI eligibility. Indeed, the trial court ordered the submission of briefs on the parties' respective post-sentence motions, and Appellant submitted a counseled brief in which he conceded the need for an amended sentencing order that properly categorized him as RRRI-ineligible. Afterward, the trial court entered the amended sentencing order that changed only Appellant's RRRI eligibility designation.

The record establishes that the trial court's amended sentencing order effected no change other than that which both parties in their court-ordered briefs had agreed was necessary—the entering of a new sentencing order that changed the patently mistaken RRRI categorization of Appellant from eligible to ineligible. Considering Appellant thus received notice of the proposed change and informed the trial court that he agreed with the proposal, we distinguish the present facts from those at issue in *Blair* and conclude that Appellant was afforded the due process protections of notice and the opportunity to respond. Accordingly, we discern no merit to his final issue.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/03/2023